## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| FISKER AUTOMOTIVE HOLDINGS, INC., et al.,[1] | ) | Case No. 13-13087 ([___]) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

## DECLARATION OF MARC BEILINSON IN SUPPORT OF FIRST DAY MOTIONS

1.      I am the Chief Restructuring Officer of Fisker Automotive Holdings, Inc., one of the above-captioned debtors and debtors in possession (collectively, the "Debtors" or "Fisker").  I have served the Debtors as Chief Restructuring Officer since October 29, 2013.  In such capacity, I have become, and am, generally familiar with the Debtors' overall day-to-day operations, business and financial affairs, and books and records.  I am over the age of 18 and authorized to submit this declaration (this "Declaration") on behalf of the Debtors.

2.      I am the Managing Partner of Beilinson Advisory Group, LLC, a financial restructuring and hospitality advisory group that specializes in assisting distressed companies.  I have more than 30 years of experience advising clients with respect to corporate reorganizations and restructurings, including experience in both the legal and financial-advisory space.  I previously served as the Chief Restructuring Officer/CEO of Eagle Hospitality and Innkeepers USA.  I also currently serve on the Board of Directors and Audit Committees of Athene Annuity, MF Global Assurance Company, and Caesars Acquisition Company, and have previously served on the Board of Directors of Wyndham Hotels, Apollo Real Estate Commercial Mortgage Inc., Innkeepers USA,

---

[1]    The Debtors, together with the last four digits of each Debtor's federal tax identification number, are: Fisker Automotive Holdings, Inc. (9678); and Fisker Automotive, Inc. (9075). For the purpose of these chapter 11 cases, the service address for the Debtors is:  5515 E. La Palma Ave., Anaheim, California 92807.

and the University of California Davis School of Law.  I previously practiced law as a restructuring professional for over 25 years and was previously a shareholder at Pachulski, Stang, Ziehl & Jones.

3.      Except as otherwise indicated herein, all facts set forth in this Declaration are based on my personal knowledge of the Debtors' operations and finances, information gathered from my review of relevant documents, and information supplied to me by other members of the Debtors' management and the Debtors' advisors.  If called upon to testify, I could and would competently testify to the facts set forth herein on that basis.

4.      The Debtors have requested a variety of relief in their "first day" motions and applications (collectively, the "First Day Motions") filed concurrently herewith to minimize the adverse effects of the commencement of these chapter 11 cases.  I am familiar with the contents of each First Day Motion, and I believe the relief sought therein is necessary to permit an effective transition into chapter 11.  I further believe the relief requested in the First Day Motions will aid in the implementation of a timely and efficient chapter 11 case that will preserve and maximize the value of the Debtors' estates.

**Preliminary Statement**

5.      The Debtors were founded in 2007 with the goal of designing, assembling, and manufacturing premium plug-in hybrid electric vehicles ("PHEVs").  To facilitate these efforts, the United States Department of Energy ("DOE") arranged for loans to the Debtors from the Federal Financing Bank (the "FFB") in an aggregate amount of up to approximately $530 million pursuant to the Advanced Technology Vehicles Manufacturing Incentive Program.[2]  The Debtors drew a total of approximately $192 million on these loans and also raised significant amounts of equity financing

---

[2]    The Advanced Technology Vehicles Manufacturing Incentive Program was promulgated under section 136 of the Energy Independence and Security Act of 2007, Pub. L. 110-140, 121 Stat. 1492, 42 U.S.C. § 17013.

DOCS_DE:190465.1 28353/001

from a wide range of venture capital, private equity, and sovereign wealth funds.  Beginning in 2007, the Debtors established a global network of vendors, suppliers, distributors, and retailers, along with an international reputation for both their award-winning Karma sedan and their innovative hybrid electric powertrain technology.  The Karma sedan is the world's first environmentally responsible luxury PHEV and was the centerpiece of the Debtors' prepetition manufacturing and sales efforts.  The Debtors sold approximately 1,800 Karma sedans to individual buyers through a global network of independent retailers and distributors.

6.      Despite these accomplishments, the Debtors were unable to achieve certain financial covenants and project milestones embedded in their loan agreements with DOE.  In particular, the Debtors' loan agreements with DOE originally required the Debtors to produce, manufacture, and sell 11,000 Karma sedans by February 2012.  But the Debtors were obliged to delay serial production of the Karma until October 2011 for a number of reasons, including completion of vehicle and manufacturing engineering, finalizing tooling and component specifications with the Debtors' supply chain, and completing safety and emissions testing and certifications.

7.      Further, once serial production of the Karma began, vehicle sales failed to meet expectations.  Factors affecting sales included negative press, initial quality and performance issues, lingering effects of the global financial recession, and challenges arising from the Debtors' supply chain.  For example, the high-voltage battery packs for the Karma, an essential component for any electric vehicle, and which were manufactured exclusively by A123 Systems, Inc.[3] ("A123"), exhibited a number of performance problems.  The Debtors initiated a voluntary safety recall for a small number of Karma vehicles almost immediately following the Karma's 2011 launch relating to A123's misalignment of internal hose clamps.  A123 also announced a service campaign in

---

[3]    A123 Systems, Inc. has since changed its name to B456 Systems, Inc.

March 2012 relating to a manufacturing defect that affected the durability and performance of all battery packs manufactured at A123's Livonia, Michigan facility.  Moreover, A123 suspended Karma battery production in October 2012 when it sought bankruptcy protection.[4]  As a result, the Debtors were left without a high-voltage battery supplier, and the Debtors have not restarted Karma vehicle production since a previously scheduled seasonal shutdown commenced in July 2012.

8.      The Debtors have at all times been mindful of their commitments to stakeholders, their obligation to preserve and maximize value, and the public interest at issue here.  To this end, and as discussed in greater detail below, the Debtors explored a series of alternatives to obtain financing to fulfill these commitments and to maximize stakeholder value, including with respect to DOE.  Among other things, the Debtors sought additional equity and debt financing to refinance the DOE loan and provide additional working capital.  More recently, the Debtors engaged with financial sponsors, original equipment manufacturers ("OEMs"), and other parties regarding a strategic investment or a going concern transaction.  In this process, the Debtors retained experienced investment banking, financial, and restructuring advisors to facilitate their review, analysis, and development of potential alternatives.[5]  The Debtors also undertook steps to minimize costs and to preserve liquidity.  These steps included, among other things, the difficult determination to conduct headcount reductions and to initiate nonpaid employee furloughs in the spring of 2013.  Notwithstanding these efforts, the Debtors' cash position continued to erode.

9.      To preserve and maximize value, the Debtors sought to implement a sale process in connection with a chapter 11 filing.  Throughout the spring of 2013, the Debtors engaged in

---

4    As discussed more fully below, A123 ultimately rejected its exclusive supply agreement with the Debtors effective as of February 2013.

5    See infra Part II.C (discussing the Debtor's prepetition restructuring efforts).

substantial, good faith negotiations with DOE regarding the Debtors' consensual use of its cash collateral to help fund a chapter 11 case and sale process. Despite significant efforts by the parties, these negotiations were ultimately unsuccessful, and DOE applied the approximately $20 million of cash that it controlled to the Debtors' outstanding indebtedness.

10.     Since that time, the Debtors have operated with limited junior funding provided by related parties. The Debtors' operations have remained curtailed, and headcount reductions have continued through both additional layoffs and voluntary attrition. The Debtors have also continued to engage in discussions and negotiations surrounding various restructuring transactions in an effort to maximize stakeholder value. Meanwhile, DOE conducted a public marketing and auction process for the purchase of its interests in the DOE loan pursuant to a competitive auction process. On October 7, 2013, an affiliate of Hybrid Tech Holdings, LLC emerged as the successful bidder, and the parties closed the loan purchase on November 22, 2013.

11.     Recognizing that this purchase would provide the Debtors with an opportunity to move forward, the Debtors entered into extensive arm's-length discussions with Hybrid Tech Holdings, LLC (the "Purchaser") and its affiliates regarding the Purchaser's potential acquisition of certain of the Debtors' assets through a credit bid of all or part of the DOE loan. These discussions culminated in the parties' entry into a purchase agreement (the "Purchase Agreement"), as more fully described herein, pursuant to which the Purchaser would acquire substantially all the Debtors assets, with the remainder of the estates' assets to be administered through a chapter 11 plan of liquidation. The Debtors have commenced these chapter 11 cases to facilitate a timely and efficient sale and plan process that will preserve and maximize the value of the Debtors' estates.

12.     To familiarize the Court with the Debtors and the relief sought at the outset of these chapter 11 cases, this Declaration is organized in three parts. Part I provides an overview of the

5

Debtors' historical operations and capital structure.  Part II describes the events leading up to the commencement of these chapter 11 cases.  Part III sets forth the relevant facts supporting the relief requested by the First Day Motions.

## Part I:  The Debtors

### A.    Overview of the Debtors' Corporate History and Business Operations

#### 1.    The Debtors' History and Operations

13.    The Debtors were formed in 2007 with the goal of designing, engineering, and manufacturing premium PHEVs.  To this end, the Debtors developed an electric vehicle with extended range, which they trademarked as "EVer."  The Debtors also established an international reputation as a leading developer of premium extended range PHEVs.  The Debtors' Karma sedan is the world's first environmentally responsible luxury PHEV, and was developed by a highly skilled team of automotive designers and engineers located in the United States.  The Karma sedan was also the centerpiece of the Debtors' operations and won awards for excellence, innovation, and environmental responsibility from Time magazine (identifying the Karma as one of the "Green Design 100" in 2009), Top Gear Magazine (identifying the Karma as "Luxury Car of the Year" in 2011), and Automobile Magazine (identifying the Karma as "Design of the Year" in 2012).

**Fisker Vehicle Designs**





| **Karma Sedan** | **Atlantic Sedan (Concept)** |

DOCS_DE:190465.1 28353/001

14.     The Karma sedans were assembled by Valmet Automotive, Inc. ("Valmet") in Uusikaupunki, Finland.  The Debtors had planned, however, to build future vehicles at a company-owned and -operated assembly facility in the United States to improve volumes and to leverage their design, engineering, and technical expertise.

15.     To that end, in July 2010, the Debtors acquired a manufacturing facility covering approximately 3.2 million square feet located on approximately 142 acres at 801 Boxwood Road, Wilmington, Delaware (the "Delaware Facility").  The Debtors purchased the Delaware Facility through the General Motors bankruptcy proceedings for a cash purchase price of approximately $21 million.  The Delaware Facility is equipped with a number of technical and utility systems for automotive manufacturing, including a paint facility, powerhouse capability, a conveyor system, a wastewater treatment facility, and an emissions abatement system.  The Debtors have not conducted active operations at that location.

16.     The Debtors obtained components and systems for the Karma's assembly through a number of third-party supply relationships.  For example, the Debtors had a licensing and tool use agreement with a General Motors affiliate.  Through this relationship, the Debtors were able to purchase parts and components directly from suppliers that also sold to General Motors and use General Motors tooling to manufacture the parts or components.  In addition, the Debtors relied on a number of "single source" suppliers for particular components.  One such "single source" supplier was A123, whom the Debtors contracted with in January 2010 to act as the exclusive manufacturer of the Karma sedan's high-voltage battery pack, as discussed more fully below.

17.     The Debtors began delivering the Karma sedan for sale to the general public in October 2011.  This milestone was the culmination of the Debtors' four-year effort to bring the Karma sedan from design, to concept car, to finished product ready for the showroom floor.  The

Karma sedan retailed for approximately $100,000 to $120,000, subject to consumer specifications and corresponding purchase price adjustments. The Debtors assembled approximately 2,700 Karma sedans, and approximately 1,800 Karma sedans have been sold to individual customers.

18.     The Debtors also planned to have another platform, the "N" or "Nina Platform," which included the prototype Atlantic sedan. The Debtors made significant progress developing the N Platform, including entering into a number of additional supply and service agreements with third-party vendors and suppliers. These agreements included an engine purchase, supply, and development agreement with Bayerische Moteren Werke Aktiengesellschaft, or BMW. The Debtors first unveiled the Atlantic sedan at the April 2012 New York Auto Show, but have not engaged in active production of the Atlantic sedan or other N Platform derivatives.

**2.     The Debtors' Sales Network and Customers**

19.     The Debtors sold the Karma sedan in the United States and Canada through a network of independent retailers located throughout the United States and Canada (each, a "Retailer"). In addition, the Debtors sold the Karma sedan in Europe, the Middle East, and China through local, independent distributors (each, a "Distributor"). Typically, Retailers and Distributors would purchase vehicles from the Debtors and then hold the vehicles for sale to the general public. A "Retail Agreement" or "Distributorship Agreement" typically governed each relationship among the parties.

20.     The Retail Agreements and Distributorship Agreements generally provided that the Retailers and Distributors would purchase vehicles directly from the Debtors and then hold those vehicles for sale in an assigned geographic territory. In certain circumstances, these Retailers and Distributors hold the right to compel the Debtors to repurchase their vehicles. Additionally, while the Retailers and Distributors bear primary responsibility for performing warranty repairs associated with sold vehicles, these warranty repairs may be subject to reimbursement from the Debtors.

8

### 3. The Debtors' Employees

21.     The Debtors currently employ approximately 21 full-time employees, located primarily at their Anaheim, California headquarters, and primarily tasked with engineering, product development, financial, and reporting functions.  None of the Debtors' employees are subject to a collective bargaining agreement.  The Debtors' current staffing level reflects significant headcount reductions and voluntary attrition in the period prior to these chapter 11 filings.

### 4. Fisker GmbH

22.     Fisker Automotive GmbH ("Fisker GmbH"), a non-Debtor in these cases, was a wholly owned subsidiary of Fisker Automotive, Inc. organized under the laws of Germany.  Fisker GmbH's office was located in Munich, Germany, and provided international sales and marketing services to the Debtors.  Fisker GmbH has no active operations.

### B. Overview of the Debtors' Capital Structure

23.     As of the Petition Date, the Debtors had approximately $203.2 million in funded debt and related obligations outstanding, consisting of the DOE Facility, the SVB Working Capital Facility, the DEDA Loan, and the Related Party Notes (each as defined herein).  As of the Petition Date, the Debtors' funded debt obligations, excluding accrued interest, are summarized as follows:

| $ millions | |
|---|---|
| DOE Facility | **$168.5** |
| SVB Working Capital Facility | **$6.6** |
| DEDA Loan | **$12.5** |
| Related Party Notes | $15.6 |
| **Total:** | **$203.2** |

In addition, the Debtors have obligations under a number of contractual and vendor-related agreements, including with respect to various prepetition supply and assembly agreements.  These obligations are discussed in turn.

9

1.      **The DOE Facility**

        a.      **The DOE Facility Generally**

24.     Fisker Automotive, Inc., as borrower ("Fisker Automotive"), Fisker Automotive Holdings, Inc. ("Fisker Automotive Holdings"), and DOE are parties to that certain Loan Arrangement and Reimbursement Agreement, dated as of April 22, 2010 (the "DOE Loan Agreement").[6]   Pursuant to the DOE Loan Agreement, DOE agreed to, among other things:  (a) arrange for purchases by the FFB of notes from Fisker Automotive in an amount not to exceed $169.3 million to fund the development, commercial production, sale and marketing, and all related engineering integration of the Debtors' Karma sedan (the "Karma Lending Facility"); and (b) arrange for purchases by the FFB of notes from Fisker Automotive in an amount not to exceed $359.4 million to fund the development, commercial production, and sale and marketing of the Debtors' Nina model automobile, now known as the Atlantic sedan, including the establishment and construction of an assembly and production site in the United States (the "Nina Lending Facility," and, together with the Karma Lending Facility, the "DOE Facility").[7]   Fisker Automotive Holdings unconditionally guaranteed obligations arising under the DOE Facility pursuant to that certain Parent Guarantee, dated as of April 22, 2010, made by Fisker Automotive Holdings in favor of DOE, FFB, and certain holders of notes.  As discussed in detail below, on November 22, 2013, DOE sold its rights under the DOE Loan Agreement and certain related agreements to an affiliate of the Purchaser.

---

6   See The Advanced Technology Vehicles Manufacturing Incentive Program, which was promulgated under section 136 of the Energy Independence and Security Act of 2007, Pub. L. 110-140, 121 Stat. 1492, 42 U.S.C. § 17013.

7   Pursuant to that certain Program Financing Agreement, dated as of September 16, 2009, between DOE and FFB, DOE is obligated to reimburse FFB for any liabilities, losses, costs, or expenses incurred by FFB from time to time with respect to the Notes or the related Note Purchase Agreement (each as defined in the DOE Loan Agreement).

25.     As of the Petition Date, the Debtors estimate that they had approximately $168.5 million in principal outstanding under the DOE Facility.  Interest on the Karma Lending Facility is payable quarterly, bears interest at a weighted average interest rate of 2.00 percent, and was scheduled to mature on April 24, 2017.  The Nina Lending Facility bears interest at a weighted average interest rate of 2.60 percent and was scheduled to mature on April 22, 2026.  The DOE Loan Agreement further required the Debtors to achieve certain construction, production, manufacturing, and other milestones necessary for the completion of the Karma project and the Nina project, each by certain pre-established dates.

26.     Obligations arising under the DOE Facility are secured by a first priority lien on substantially all the Debtors' assets, including personal and real property, pursuant to that certain Amended and Restated Pledge and Security Agreement, dated as of July 30, 2010 (the "Pledge and Security Agreement"), between Fisker Automotive and PNC Bank, N.A., d/b/a Midland Loan Services, a division of PNC Bank, N.A., as successor by merger to Midland Loan Services, Inc., as collateral agent (the "Collateral Agent").[8]

27.     In particular, DOE held an exclusive, first priority security interest in a debt service reserve account established pursuant to the DOE Loan Agreement (the "DOE Debt Service Reserve Account"), which was controlled by DOE.  The DOE Debt Service Reserve Account formerly held approximately $20.6 million of cash.  During the spring of 2013, the Debtors engaged in substantial, good-faith negotiations with DOE regarding the Debtors' access to funds held in the DOE Debt Service Reserve Account.  However, and despite significant efforts by the parties, these

---

[8]    The collateral pledged to secure obligations arising under the DOE Facility specifically excludes, among other things, the Debtors' rights to or interests in any lease, contract, property rights, agreement, or trademark if the grant of a security interests in such property would result in (a) the cancellation or unenforceability of the Debtors' right or interest, or (b) a breach, default, or termination of any such property (collectively, the "Excluded Assets").

negotiations were ultimately unsuccessful, and DOE applied the funds held in the DOE Debt Service Reserve Account to the Debtor's outstanding indebtedness in March 2013. As of the Petition Date, approximately $0 remains in the DOE Debt Service Reserve Account.

### b. Business Covenants Arising Under the DOE Loan

28. In addition to traditional financial reporting, fixed charge, and EBITDA covenants, the DOE Loan Agreement imposed a number of milestones and obligations with respect to the Debtors' business plan and performance. Among other things, the DOE Loan Agreement required the Debtors to: (a) achieve Karma sales of 11,000 units by February 29, 2012; (b) achieve an average Karma selling price of not less than $87,900 by that time; and (c) obtain $270.0 million of incremental equity financing by October 2010. The covenants and milestones provided under the DOE Loan Agreement materially affected the Debtors' ability to pursue projects or transactions not contemplated by the business plan originally submitted to DOE in 2010.

### 2. The SVB Working Capital Facility

29. Fisker Automotive, as borrower, Fisker Automotive Holdings, as obligor, and Silicon Valley Bank ("SVB"), as lender, are parties to that certain Loan Agreement dated as of July 30, 2010 (the "SVB Loan Agreement"). The SVB Loan Agreement provided for a term loan facility and an asset-based revolving credit facility in the total amount of $21.0 million (the "SVB Working Capital Facility"). As of the Petition Date, a term loan of approximately $6.6 million remains outstanding on the SVB Working Capital Facility, and SVB is no longer providing the Debtors funding under the SVB Loan Agreement. The SVB Working Capital Facility has a weighted average interest rate of 9.00 percent and was scheduled to mature on July 30, 2014.[9]

---

[9] Pursuant to correspondence dated April 5, 2013, SVB has taken the position that an event of default occurred under the SVB Loan Agreement on account of an unpaid principal and interest payment due on April 1, 2013.

30.    Pursuant to the Pledge and Security Agreement, obligations arising under the SVB Working Capital Facility are also secured by a lien on substantially all the Debtors' personal property.[10]  However, the collateral securing the SVB Working Capital Facility excludes, among other things, cash held in the DOE Debt Service Reserve Account and the Delaware Facility.

### 3.    The DEDA Agreements

#### a.    The DEDA Loan Agreement

31.    Fisker Automotive, Fisker Automotive Holdings, and the Delaware Economic Development Authority ("DEDA"), a body corporate and politic constituted as an instrumentality of the State of Delaware, are parties to that certain Loan and Security Agreement dated as of December 10, 2010 (the "DEDA Loan Agreement").  The DEDA Loan Agreement provided for a $12.5 million interest-free loan (the "DEDA Loan") to the Debtors,[11] the proceeds of which were to be used to fund the Debtors' infrastructure improvements and upgrades at the Delaware Facility.[12] As of the Petition Date, approximately $12.5 million remains outstanding under the DEDA Loan, which was scheduled to mature June 1, 2015.

32.    Obligations arising under the DEDA Loan are secured by a security interest in substantially all the Debtors' personal and real property, including the Delaware Facility, although such collateral excludes the cash held in the DOE Debt Service Reserve Account and the Excluded

---

10    On July 30, 2010, Fisker Automotive, Fisker Automotive Holdings, and the Collateral Agent, on behalf of DOE and SVB, entered into that certain Amended and Restated Collateral Agency Agreement, which created certain payment priorities between the DOE and SVB with respect to proceeds from different pools of collateral securing the Debtors' obligations to DOE and SVB.

11    The DEDA Loan Agreement was entered-into by the DEDA pursuant to the Delaware Strategic Fund Program, 29 Del. C. §§ 5027–29 (the "Delaware Fund Program").

12    The DEDA Loan Agreement provides that, subject to Fisker Automotive satisfying certain conditions set forth in the DEDA Loan Agreement relating to the employment of full-time employees and capital expenditures at the Delaware Facility, on or after June 1, 2015, up to the full amount of the DEDA Loan could convert to a grant.  As of the date hereof, these milestones have not been achieved.

Assets.[13]   On December 10, 2010, Fisker Automotive, Fisker Automotive Holdings, and DOE entered into that certain Third Amendment to the DOE Loan Agreement (the "Third Amendment") requiring the Debtors to establish a collateral reserve account (the "DEDA Reserve Account") with the Collateral Agent.   DOE controls the DEDA Reserve Account and has the power to direct the Collateral Agent to disburse funds held in the DEDA Reserve Account.   DOE used this power shortly after its seizure of the cash in the DOE Debt Service Reserve Account to also sweep the cash in the DEDA Reserve Account.   Thus, approximately $0 remains in the DEDA Reserve Account as of the Petition Date.

### b.    The DEDA Grant

33.    Fisker Automotive and DEDA are also parties to that certain Grant Agreement dated as of December 10, 2010 (the "DEDA Grant"), pursuant to which DEDA granted up to $9.0 million to Fisker Automotive under the Delaware Fund Program to be used to offset utility costs incurred while the Debtors renovated and upgraded the Delaware Facility.   Payments under the DEDA Grant were disbursed to Fisker Automotive from time to time as needed to reimburse the Debtors for "Eligible Utility Costs," which are generally defined by the DEDA Grant to cover certain utility costs incurred during the renovation of the Delaware Facility.   DEDA provided approximately $7.5 million in funding pursuant to the DEDA Grant, but is no longer providing the Debtors with additional funding.   All or a portion of the DEDA Grant will convert to an interest-free loan upon the occurrence of certain conditions, including the Debtors' failure to employ at least 1,495 full-time

---

13    As discussed more fully in the *Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing Postpetition Financing, (II) Granting Liens and Providing Superpriority Administrative Expense Priority, (III) Authorizing Use of Cash Collateral, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, and (VI) Scheduling a Final Hearing Pursuant to Sections 105, 361, 362, and 364(c) of the Bankruptcy Code and Bankruptcy Rules 2002, 4001, and 9014* (the "DIP Motion"), the DEDA Subordination Agreement (as defined therein) subordinates DEDA's interest in the collateral to those of DOE and SVB.

employees at the Delaware Facility on March 1, 2015, or upon the occurrence of an event of default under the DEDA Loan Agreement.

### 4.    The Related Party Notes

34.    Commencing on April 16, 2013, the Debtors received approximately $15.6 million in financing on an unsecured basis through a series of promissory notes and loan agreements (collectively, the "Related Party Notes") entered into by the Debtors and certain related parties, including Ace Strength International Limited, FAH Loan Purchase Fund, LLC, GSR Principals Fund IV, L.P., GSR Special Situation I Limited, GSR Ventures IV, L.P., JR Holdings IV, Ltd., and SugarPine Kids Trust and certain of their respective Affiliates.  The Related Party Notes bear interest at a fixed rate of 10% per annum and were used to fund prepetition working capital needs and for other prepetition general corporate purposes.  The Related Party Notes mature on the later to occur of (a) the sale, transfer, or disposition of all or substantially all the Debtors' assets; (b) the Debtors' dissolution or liquidation; or (c) 12 months from the date of the applicable promissory note, unless terminated earlier pursuant to their terms.

### 5.    Other Claims

35.    The Debtors' capital structure also includes certain claims that may be secured by either security agreements or statutory or possessory liens.  For example, Valmet holds certain work in progress and other inventory and has asserted its right to liquidate this inventory to satisfy claims that may be owing to Valmet.  The Debtors are also parties to a number of supply and assembly agreements that give rise to substantial obligations on account of such agreements, including obligations relating to accounts payable, material authorizations and suspended shipments, and obligations for the settlement of certain volume-related charges under the Valmet Agreement, although analysis of such obligations remains ongoing.  In addition, the Debtors are subject to a significant level of litigation and collection proceedings pending as of the Petition Date.

6. **Equity**

36.     The Debtors are privately held.  Fisker Automotive Holdings is owned by a diverse group of venture capital, private equity, and sovereign wealth funds, as well as private individuals. The Debtors' equity capital consists of common stock and seven series of convertible preferred stock.  Fisker Automotive Holdings, in turn, owns 100 percent of the shares in Fisker Automotive.

## Part II:  Events Leading to the Chapter 11 Cases

37.     Since their inception, the Debtors pursued a strategy committed to the design, development, engineering, and production of high performance and environmentally responsible PHEVs.  This strategy was reflected by the Debtors' loan agreements, through which the Debtors were obliged to, among other things, achieve sales in excess of 11,000 vehicles less than 5 years from their initial inception and to employ approximately 1,500 full-time employees in automobile manufacturing here in the United States.  The Debtors' ability to achieve their original sales and production goals, however, was limited by a combination of negative press, lingering effects of the global financial recession, unforeseen business disruptions, and liquidity shortfalls, among other factors.

## A.     Challenging Operating Environment

38.     The Debtors, like most OEMs, were responsible for the overall engineering, design, and development of the Karma sedan.  In this process, the Debtors leveraged the expertise of a wide range of suppliers and service providers to complete the engineering work and to manufacture the thousands of parts and components necessary to complete each Karma sedan.  In addition, and as noted above, Karma assembly was contracted to Valmet under the Valmet Agreement—although, the Debtors' business plan contemplated that assembly operations could ultimately be brought "in house."  As a result, Karma production remained dependent on the seamless interaction of suppliers located across North America, Europe, and Asia.

16

39.     Building the Fisker platform, supply chain, and network of Retailers and Distributors from scratch ultimately delayed the initial Karma launch from 2009 until 2011.  This delay created significant challenges with respect to the Debtors' February 2012 deadline to sell more than 11,000 Karma sedans at an average selling price of $87,900, as required by the DOE Loan Agreement.[14] The Debtors further believe that sales were adversely affected by negative press with respect to Karma performance, their existing liquidity position, and the A123 battery recall.

40.     In particular, these challenges were exacerbated by severe complications arising from the Debtors' relationship with A123.  As noted above, A123 was formerly the exclusive high-voltage battery pack manufacturer for the Karma sedan.  The Debtors encountered a number of issues with the performance of the A123 battery packs almost immediately following the Karma's launch in October 2011.  At or about that time, the Debtors conducted a voluntary safety recall to check and correct a potential misalignment of internal hose clamps within the battery packs.  In March 2012, A123 announced a voluntary service campaign to replace all Karma battery packs because of a faulty manufacturing process at A123's production facility in Livonia, Michigan, that affected the expected performance and durability of the battery packs—the problem that caused a Karma sedan to shutdown during testing by Consumer Reports.

41.     A123 did not complete the service campaign and later suspended its production of Karma battery packs.[15]  As a result, the Debtors were left with approximately a $48.7 million warranty claim against A123's bankruptcy estate and no supply of high-voltage battery packs to

---

14    As noted above, approximately 1,800 Karma sedans have been sold to individual customers.

15    A123 sought bankruptcy protection in October 2012 and, following its acquisition by Wanxiang Group Corp. in January 2013, rejected its battery pack supply agreement with the Debtors.

continue Karma production.[16]    Facing these challenges, the Debtors have not restarted Karma production following a previously scheduled seasonal shutdown that began in July 2012.

42.    The Debtors suffered an additional loss on October 29, 2012, when Hurricane Sandy and its related windstorms, storm surges, and floods, destroyed approximately 338 Karma sedans located at the port in Newark, New Jersey.  These vehicles represented substantially all of Fisker's then-available Karma inventory in the United States.  The Debtors' insurance carriers denied coverage for the loss.  After filing suit, the Debtors settled their coverage claims for an amount far less than the approximately $30 million wholesale value of the destroyed vehicles in order to avoid the risk and cost of protracted litigation with their insurance carriers.

## B.    Prepetition Covenant Defaults and Capital-Raising Efforts

43.    As noted above, the DOE Loan Agreement required the Debtors to achieve various performance milestones, including the Debtors' obligation to sell 11,000 Fisker sedans by February 29, 2012.  Fisker did not achieve certain of these milestones in light of, among other things, the performance challenges discussed above.  The Debtors' operating position was further complicated in 2011 when DOE informed the Debtors that it would not honor future disbursement requests under the DOE Facility, and since that time DOE has ceased all funding under the DOE Facility.  The Debtors subsequently engaged in good faith negotiations with DOE regarding modification or waiver of certain conditions imposed by the DOE Loan Agreement, through which the Debtors agreed to raise additional equity capital to fund operations and improve the Debtors' overall capitalization.  Since DOE suspended its funding commitments in 2011, the Debtors raised

---

16    On April 17, 2013, the United States Bankruptcy Court for the District of Delaware approved the Debtors' stipulation with A123 settling the Debtors' claims against A123—the approximately $48.7 million warranty claim and a $91.2 million contract damages claim—for approximately $15 million.  In re A123 Sys., Inc., No. 12-12859 (Bankr. D. Del. Oct. 16, 2012) [Docket No. 1467].  The Debtors subsequently sold their warranty claim, and, pursuant to their settlement, the Debtors' $91.2 million contract damages claim was disallowed.

approximately $500 million of new capital in three separate equity raises while continuing negotiations with DOE.

## C.     Prepetition Restructuring Efforts

44.     Commencing in early 2012, the Debtors began exploring strategic alternatives with respect to their business and operations.  To facilitate this process, the Debtors retained Evercore Group L.L.C. ("Evercore") on two separate occasions to explore strategic alliances, junior equity investment opportunities, or, potentially, a going-concern sale transaction with one or more parties with respect to the Debtors' business.  Evercore's initial efforts led to the exchange of several letters of intent between the Debtors and a major automotive OEM with a respect to a potential strategic alliance.  Despite substantial negotiations, including meetings with the Debtors' management, the parties were ultimately unable to agree to a transaction and terminated further discussions in July 2012.

45.     The Debtors then reengaged Evercore in December 2012 to search more broadly, and in early 2013 Evercore engaged a worldwide universe of more than 50 prospective strategic and financial investors through a structured process designed to publicize the opportunity and induce interest in a transaction.  Again, management was actively involved with discussions with potentially interested parties, and approximately thirteen parties executed non-disclosure agreements and accessed an extensive electronic data room.  Of these parties, two submitted preliminary non-binding proposals; however, the Debtors were again unable to reach definitive agreements with any of the potential purchasers, due to the Debtors' inability to, among other things: (a) secure additional financing to fund a potential sale transaction; (b) reach an agreement with DOE regarding the consensual use of cash collateral to fund a potential chapter 11 case; and (c) secure third-party financing to fund a potential chapter 11 sale process.

46.     The Debtors then sought to market their assets for sale in three discrete groups, with the goal of reaching agreements with one or more bidders that would serve as stalking horses for a sale process in chapter 11 that would be funded by either DOE or third parties.  Based on information gleaned from their interactions in the prior processes, Evercore re-solicited interest on this basis from fifteen parties.  Again, however, the Debtors were unable to reach definitive agreements with any parties, again, largely due to funding issues.

47.     In addition to these efforts to locate a transaction partner, the Debtors also took substantial additional steps over the past year to address their liquidity position and preserve operational stability as much as reasonably possible.  The Debtors engaged financial advisors that facilitated the Debtors' efforts to preserve liquidity, while permitting executive management to continue to focus on the Debtors' overall business plan and strategic alternatives.  The financial advisors, in conjunction with the Debtors' management team and Evercore, continued to negotiate with DOE to provide for the Debtors' continued access to liquidity on a prepetition basis.  Similarly, the Debtors implemented a cash preservation plan that facilitated the Debtors' efforts to maintain liquidity as they continued to explore strategic alternatives.

48.     Despite their extensive efforts to preserve cash and execute on a restructuring transaction outside a chapter 11 process, no transaction with investors or purchasers materialized, and the Debtors' liquidity position continued to deteriorate.  As a result, the Debtors made the difficult decision to implement nonpaid employee furloughs and a series of headcount reductions, including voluntary attrition, beginning during the spring of 2013.

49.     The Debtors continued to explore potential strategic alternatives, but were unsuccessful until their universe of available restructuring alternatives materially shifted in mid-2013 when DOE commenced a marketing and auction process for its interests under the DOE

Loan Agreement.  The DOE auction process commenced on September 17, 2013, when DOE publicized its plan to sell its interests through a competitive auction.  The Debtors actively facilitated diligence and engaged with DOE throughout this process, and it is my understanding that DOE received over twenty written expressions of interest in performing due diligence and participating in the auction process.  I further understand that those expressing interest were contacted by DOE's financial advisor, Houlihan Lokey Capital, Inc. ("Houlihan"), and over half of the potentially interested parties executed non-disclosure agreements with DOE and the Debtors.  Approximately half of these potentially interested parties that executed non-disclosure agreements ultimately submitted binding bids before the October 7, 2013 bid deadline, and I further understand that Houlihan conducted the final, live phase of the auction on October 11, 2013.  An affiliate of the Purchaser was the successful bidder, and the parties closed the loan purchase on November 22, 2013.

50.    Recognizing that the DOE marketing and auction process would provide the Debtors with an opportunity to move forward with their restructuring process, the Debtors entered into extensive arm's-length discussions with the Purchaser regarding the Purchaser's potential acquisition of certain of the Debtors' assets through a credit bid of all or part of the DOE loan.  These discussions culminated in the parties' entry into the Purchase Agreement described below.

**D.    The Proposed Sale**

51.    Contemporaneously herewith, the Debtors filed a motion (the "Sale Motion") seeking authorization of a sale, pursuant to the Purchase Agreement, of substantially all of the Debtors' assets to the Purchaser free and clear of all claims, liens, and other encumbrances pursuant to section 363 of the Bankruptcy Code in exchange for, among other things:  (a) $75 million in the form of a credit bid of claims owned by the Purchaser under the DOE loan; (b) the Purchaser's agreement to waive $4 million of claims held by the Purchaser or its affiliates under the Debtors'

proposed postpetition financing;[17] and (c) the assumption of customary liabilities in accordance with the Purchase Agreement.  In addition, the Purchaser has committed to support the Debtors' proposed chapter 11 plan by, among other things, funding up to $725,000 in creditor distributions pursuant to the Plan, each as set forth more fully in the Purchase Agreement.

52.     In evaluating the benefits and issues associated with another marketing process, the Debtors determined that a sale to a third party other than the Purchaser was highly unlikely to generate greater value than the Debtors' proposed sale transaction or advisable under the facts and circumstances of these chapter 11 cases.  Specifically, as the Debtors' senior secured lender, the Purchaser holds approximately $168.5 million in claims secured by substantially all of the Debtors' assets.  As a result, I believe the Purchaser holds an overwhelming advantage in any prospective sale process.  Thus, given that a competitive auction process or pursuing a potential transaction with an entity other than the Purchaser would be highly unlikely to increase value for the Debtors' estates—particularly given the extensive prepetition marketing efforts conducted by both the Debtors and DOE prior to the date hereof—the Sale Motion seeks approval of a private sale.  The Debtors believe that a private sale will maximize value for the benefit of all creditors and clear the way for the Debtors to expeditiously complete these chapter 11 cases.

**E.      Chapter 11 Plan Process**

53.     The Debtors intend to file their proposed chapter 11 plan promptly after the commencement of these cases.  Generally, the Debtors seek to utilize proceeds from the Purchase Agreement, the Purchaser's additional undertakings to fund creditor recoveries, and their remaining assets to administer these chapter 11 estates, fund creditor recoveries, and bring these chapter 11

---

[17]    As set forth more fully in the DIP Motion, the Purchaser is also an affiliate of the Debtors' proposed DIP lender.

cases to a prompt conclusion.  The Debtors further anticipate seeking approval of their related disclosure statement and plan confirmation in the near term.

## Part III:  First Day Motions

54.    To minimize the adverse effects of the commencement of these chapter 11 cases on the Debtors' ability to effectuate a timely and efficient sale and plan process that will preserve and maximize the value of the Debtors' estates, the Debtors have filed or will file requests for various types of relief in their First Day Motions filed contemporaneously herewith.  I have reviewed each of the First Day Motions, including any exhibits thereto, and incorporate by reference each of the factual statements set forth in the First Day Motions.  I believe that  the relief requested by the First Day Motions is necessary to enable the Debtors to preserve value and efficiently implement the proposed sale and plan process with minimal disruption and delay.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

DOCS_DE:190465.1 28353/001

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my information and belief.

Dated:  November 22, 2013                    Respectfully submitted,

Marc Beilinson
Chief Restructuring Officer
Fisker Automotive Holdings, Inc.
5515 E. La Palma Ave.
Anaheim, California 92807