**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| FISKER AUTOMOTIVE HOLDINGS, INC., et al.,[1] | ) | Case No. 13-13087 ([___]) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**MOTION OF THE DEBTORS FOR ENTRY OF INTERIM AND**
**FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO (A) CONTINUE TO**
**OPERATE THE CASH MANAGEMENT SYSTEM, (B) HONOR CERTAIN**
**PREPETITION OBLIGATIONS RELATED THERETO, (C) CONTINUE**
**CURRENT INVESTMENT PRACTICES, AND (D) MAINTAIN EXISTING**
**BUSINESS FORMS; AND (II) GRANTING RELATED RELIEF**

The above-captioned debtors (collectively, the "Debtors") file this motion (this "Motion") for entry of interim and final orders (the "Interim Order" and the "Final Order," respectively), substantially in the forms attached hereto as Exhibit A and Exhibit B, respectively, (I) authorizing the Debtors to: (a) continue to operate their cash management system (the "Cash Management System"); (b) honor certain prepetition obligations related thereto; (c) continue current investment practices; and (d) maintain existing business forms; and (II) granting related relief. In support of this Motion, the Debtors respectfully state as follows:

**Jurisdiction**

1.     The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware,

---

[1]    The Debtors, together with the last four digits of each Debtor's federal tax identification number, are: Fisker Automotive Holdings, Inc. (9678); and Fisker Automotive, Inc. (9075). For the purpose of these chapter 11 cases, the service address for the Debtors is: 5515 E. La Palma Ave., Anaheim, California 92807.

dated February 29, 2012.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Court may enter a final order consistent with Article III of the United States Constitution.

2.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory bases for the relief requested herein are sections 345 and 363 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 2015-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules").

## Relief Requested

4.      The Debtors seek entry of the Interim and Final Orders: (I) authorizing the Debtors to (a) continue to operate the Cash Management System, as illustrated on Exhibit 1 annexed to Exhibit A attached hereto, (b) honor certain prepetition obligations related thereto, (c) continue current investment practices, and (d) maintain existing business forms; and (II) granting related relief.

## Background[2]

5.      On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  Concurrently with the filing of this Motion, the Debtors filed a motion requesting procedural consolidation and joint administration of these chapter 11 cases

---

2    A description of the Debtors' businesses and the facts and circumstances supporting the relief requested by this Motion are set forth more fully in the *Declaration of Marc Beilinson in Support of First Day Motions* (the "First Day Declaration"), filed contemporaneously herewith.

pursuant to Bankruptcy Rule 1015(b).  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no committees have been appointed or designated.

6.      The Debtors are leading designers and developers of electric vehicles with extended range technology, which are also known as Plug-in Hybrid Electric Vehicles, or "PHEVs."  The Debtors' PHEVs combine performance, efficiency, and convenience with minimal environmental impact versus traditional internal combustion vehicles.  Although the Debtors have suspended active vehicle production, for the twelve months ended December 31, 2012, the Debtors generated approximately $160 million in total revenues, derived primarily from sales of the award-winning Karma Sedan, the Debtors' first production vehicle.  As of December 31, 2012, the Debtors reported liabilities totaling approximately $500 million.

## The Cash Management System

### I.      Overview

7.      The Cash Management System is similar to the centralized cash management systems used by other comparably-sized companies to manage cash flow in a cost effective, efficient manner.  The Debtors use the Cash Management System in the ordinary course of their business to collect, transfer, and disburse funds generated from their operations and to facilitate cash monitoring, forecasting, and reporting.  The Debtors' treasury department maintains oversight of the Cash Management System and implements cash management controls for entering, processing, and releasing funds.  The Debtors' treasurer is the only individual authorized to unilaterally move funds on behalf of the Debtors through the Cash Management System.  Although the Debtors have suspended active vehicle production, preservation of the Cash Management System as it existed during normal course operations is essential to preserving and maximizing value for the Debtors' stakeholders.

## II.    Bank Accounts, Collections, and Disbursements

8.      The Cash Management System includes nine bank accounts in the United States (the "U.S. Bank Accounts") and two bank accounts outside of the United States (the "Non-U.S. Bank Accounts," and together with the U.S. Bank Accounts, the "Bank Accounts"),[3] each of which are identified on Exhibit 2 annexed to Exhibit A attached hereto.    The U.S. Bank Accounts reside at the following banks:  Citibank N.A.; Silicon Valley Bank; and PNC Bank. The Non-U.S. Bank Accounts reside at the following banks:  a United Kingdom based affiliate of Citibank N.A. ("Citi London"); and Commerzbank.    The Debtors believe that only one of the Bank Accounts is an "investment account," as contemplated in section 345(b) of the Bankruptcy Code, as described more fully below.

9.      In addition, to support the Debtors' prepetition capital structure, the Debtors prepetition financing documents required the opening of three bank accounts in the United States (the "Working Capital Collateral Account," the "Non-Working Capital Shared Collateral Account," and the "Exclusive Collateral Account," each as defined in certain of the Debtors' prepetition financing documents, collectively, the "Collateral Accounts") held by PNC Bank, N.A., d/b/a Midland Loan Services, a division of PNC Bank, N.A., as successor by merger to Midland Loan Services, Inc., in its capacity as collateral agent (the "Collateral Agent") under the Debtors' prepetition secured credit facility (the "Prepetition Credit Facility") with the United States Department of Energy ("DOE").    The Collateral Accounts reside at PNC Bank.    As described in the First Day Declaration, on November 22, 2013, Hybrid Technology, LLC purchased DOE's position under the Debtors' prepetition secured credit facility with DOE and,

---

3    While as of the Petition Date, the Cash Management System includes the 11 Bank Accounts, in the ordinary course of business, the Debtors may close existing accounts or open new accounts.  In addition, the Debtors hold several bank accounts at HSBC Bank N.A. that are not currently active, contain no funds, and do not play a role in the Cash Management System.

for all practicable purposes, succeeded to DOE's position as the Debtors' senior secured lender (Hybrid Technology, LLC or DOE, as applicable, the "Senior Secured Lender").

### A.   U.S. Bank Accounts, Collections, and Disbursements

10.   The U.S. Bank Accounts are each held by Debtor Fisker Automotive, Inc., and are comprised of:[4]

- one central concentration account (the "Central Concentration Account");
- one collection-only zero balance account (the "Collections ZBA");
- one collection and disbursement zero balance account (the "Collection/Disbursement ZBA");
- two disbursement-only zero balance accounts (the "Disbursement ZBAs");
- one debt service account (the "SVB Debt Service Account");
- one debt service reserve account (the "Debt Service Reserve Account");
- one additional potential liabilities reserve account (the "DEDA Reserve Account"); and
- one landlord collateral account (the "Landlord Collateral Account").

11.   As illustrated on Exhibit 1 annexed to Exhibit A attached hereto, the Cash Management System is based around the Central Concentration Account, the Debtors' primary operating account.  During normal course operations, cash generated by the Debtors' operations generally flowed into the Cash Management System by way of wire or automatic clearing house ("ACH") transfers to either the Collections ZBA or the Collection/Disbursement ZBA.  On a daily basis, any funds in the Collections ZBA and the Collection/Disbursement ZBA were automatically swept into the Central Concentration Account where the funds remained until transferred to another account for disbursement.  Certain funds also flowed directly into the Central Concentration Account (e.g. funds collected outside of ordinary course operations, such as proceeds from litigation settlements).  The Debtors manually transferred funds from the

---

4   Each of the U.S. Bank Accounts is discussed in detail below.

Central Concentration Account back to the Collection/Disbursement ZBA, or to the Disbursement ZBAs, to fund operations. Each of the Central Concentration Account, Collections ZBA, the Collection/Disbursement ZBA, and Disbursement ZBAs is subject to a deposit account control agreement which grants the Collateral Agent for the benefit of the Senior Secured Lender the right to control the accounts in certain circumstances.

12. For a period prior to the Petition Date, the limited junior funding provided by related parties to fund the Debtors' operations also flowed directly into the Central Concentration Account. In addition, revenue generated in the U.S. from the Debtors' sale of spare part and used vehicle inventory flowed directly into the Central Concentration Account and through the Debtors' Cash Management System. Currently, funds are disbursed directly from the Central Concentration Account to pay for the Debtors' limited U.S. operating expenses, including, by way of example, utilities and rent for the Debtors' corporate headquarters in Anaheim, California. None of the collection and disbursement ZBAs are currently utilized, except for the Payroll Disbursement ZBA, which the Debtors use to disburse payroll to their employees in accordance with ordinary course prepetition practice. In addition, although the Debtors are not currently able to transact via ACH transfers, transactions via ACH transfer are an important component of the Debtors' normal course operations.

13. During normal course operations, the Debtors also manually transferred funds from the Central Concentration Account to the SVB Debt Service Account for payment of principal and interest owed pursuant to the Debtors' prepetition secured credit facility with Silicon Valley Bank ("SVB"). In certain circumstances, as permitted under the credit facility with SVB, the Debtors also drew funds from the SVB Debt Service Account which were transferred to the Central Concentration Account pending disbursement to fund operations.

6

14.    The Debt Service Reserve Account, created pursuant to and governed by the Prepetition Credit Facility, is a reserve account established to hold funds that are intended to collateralize upcoming principal and interest payments due under the Prepetition Credit Facility. The Debt Service Reserve Account is subject to a duly executed control agreement in favor of the Collateral Agent for the benefit of the Senior Secured Lender.    During normal course operations, on a quarterly basis, the Debtors manually transferred funds directly from the Central Concentration Account to the Debt Service Reserve Account for payment of principal and interest owed pursuant to the Prepetition Credit Facility.    There are no funds remaining in the Debt Service Reserve Account.

15.    The DEDA Reserve Account, created pursuant to and governed by the Prepetition Credit Facility, is a reserve account established to hold funds that are intended to ensure availability of cash to:  (a) initially, pay a "Lien Forbearance Fee" that would be payable to secure a forbearance under the Debtors' prepetition secured credit facility with the Delaware Economic Development Authority ("DEDA"); and (b) upon DOE's determination in its sole discretion, pay other liabilities under the prepetition secured credit facility with DEDA.  As of the date hereof, there were no funds held in the DEDA Reserve Account.  The DEDA Reserve Account is held by the Collateral Agent for the benefit of the Senior Secured Lender, who has the right to control the account.  The Debtors also maintain the Landlord Collateral Account which holds restricted cash that collateralizes the Debtors' obligations pursuant to the lease for the Debtors' corporate headquarters in Anaheim, California.  As of the date hereof, the Landlord Collateral Account holds approximately $1.6 million in restricted cash.

16.    The Collateral Accounts were required to be established in the name of the Collateral Agent to hold and distribute funds after an event of default under the Prepetition

7

Credit Facility had occurred. Upon delivery of a notice of default under the Prepetition Credit Facility, money would be transferred to the Collateral Accounts and distributed to the Senior Secured Lender and/or SVB in accordance with the terms of the Prepetition Credit Facility and a related intercreditor agreement.

17.     The following table describes the function of the U.S. Bank Accounts during normal course operations and after suspension of active vehicle production in further detail:

| U.S. Bank Account | Description |
| --- | --- |
| **Central Concentration Account**<br>Account No. xxxxxxxx1120 | The Central Concentration Account, the Debtors' primary operating account, is a concentration account maintained by Fisker Automotive, Inc. at Citibank N.A. During normal course operations, funds collected from operations were either automatically swept or manually transferred into the Central Concentration Account from the Debtors' U.S. and international collection accounts, and the Debtors manually transferred funds from the Central Concentration Account as needed to fund operations or debt service. Certain funds also flowed directly into the Central Concentration Account. Prior to the Collateral Enforcement Action, on a limited basis, funds were manually transferred into the Central Concentration Account from the Debt Service Reserve Account. For a period prior to the Petition Date, the limited junior funding provided by related parties to fund the Debtors' operations also flowed directly into the Central Concentration Account. In addition, revenue generated in the U.S. from the Debtors' sale of spare part and used vehicle inventory flowed directly into the Central Concentration Account and through the Debtors' Cash Management System. Currently, funds are disbursed directly from the Central Concentration Account to pay for the Debtors' limited U.S. operating expenses. Funds are also disbursed to the Payroll Disbursement ZBA to fund the Debtors' payroll. The Central Concentration Account generally maintains a positive balance. |
| **Collections ZBA**<br>Account No. xxxxxxxx1096 | The Collections ZBA is a zero balance account maintained by Fisker Automotive, Inc. at Citibank N.A. During normal course operations, the Collections ZBA collected funds, via wire or ACH transfer, generated by the Debtors' wholesale of vehicles to dealerships and distributers in the U.S. On a daily basis, funds collected in the Collections ZBA were automatically swept into the Central Concentration Account. The Collections ZBA generally maintained a zero balance and, as of the Petition Date, there were no funds in the Collections ZBA. |
| **Collection/Disbursement ZBA**<br>Account No. xxxxxxxx8813 | The Collection/Disbursement ZBA is a zero balance account maintained by Fisker Automotive, Inc. at Citibank N.A. During normal course operations, the Collections/Disbursement ZBA collected or disbursed funds to or from the dealerships with which the Debtors conducted business in the U.S. On a monthly basis, the Debtors reconciled their accounts with the dealerships and either disbursed (through a manual transfer of funds from the Central Concentration Account to the Collections/Disbursement ZBA) or collected (via wire or ACH transfer) funds, based on the positive or negative balance remaining after the dealer account reconciliation. On a daily basis, funds collected in the Collection/Disbursement ZBA were automatically swept into the Central Concentration Account. The Collection/Disbursement ZBA generally maintained a zero balance and, as of the Petition Date, there were no funds in the Collections/Disbursement ZBA. |

| | |
|---|---|
| **Payroll Disbursement ZBA**<br>Account No. xxxxxxxx1088 | The Payroll Disbursement ZBA, one of the Debtors' two disbursement-only ZBAs, is a zero balance account maintained by Fisker Automotive, Inc. at Citibank N.A.  Both during normal course operations and as of the Petition Date, the Payroll Disbursement ZBA disbursed funds to the Debtors' U.S. employees for payroll.  Approximately twice per month, the Debtors manually transfer payroll funds from the Central Concentration Account to the Payroll Disbursement ZBA for distribution that day.  The Payroll Disbursement ZBA generally maintains a zero balance and, as of the Petition Date, there were no funds in the Payroll Disbursement ZBA. |
| **AP Disbursement ZBA**<br>Account No. xxxxxxxx1112 | The AP Disbursement ZBA, the other of the Debtors' two disbursement-only ZBAs, is a zero balance account maintained by Fisker Automotive, Inc. at Citibank N.A.  During normal course operations, the AP Disbursement ZBA disbursed funds for payment of the Debtors' ordinary course U.S. accounts payable (e.g. vendor payments, rent, etc.).  The Debtors manually transferred funds from the Central Concentration Account to the AP Disbursement ZBA, as needed.  The AP Disbursement ZBA generally maintained a zero balance and, as of the Petition Date, there were no funds in the AP Disbursement ZBA. |
| **SVB Debt Service Account**<br>Account No. xxxxxx2383 | The SVB Debt Service Account is a checking account maintained by Fisker Automotive, Inc. at Silicon Valley Bank.  During normal course operations, the Debtors manually transferred funds from the Central Concentration Account to the SVB Debt Service Account for payment of principal and interest owed pursuant to the Debtors' prepetition secured credit facility with SVB.  SVB monitored the SVB Debt Service Account and, in certain circumstances as permitted under the SVB credit facility, the Debtors would also draw funds from the SVB Debt Service Account which were transferred to the Central Concentration Account pending disbursement to fund operations.  Although not a zero balance account, the Debtors did not maintain a balance in the SVB Debt Service Account and, as of the Petition Date, there were no funds in the SVB Debt Service Account. |
| **Debt Service Reserve Account**<br>Account No. xx-xx-xxx-xxx5001 | The Debt Service Reserve Account is a reserve account held by Fisker Automotive, Inc. at PNC Bank.  The Debt Service Reserve Account was intended to collateralize the Debtors' obligations under the Prepetition Credit Facility.  The Debt Service Reserve Account was created pursuant to and is governed by the Prepetition Credit Facility, and was intended to hold approximately six-months of principal and interest due under the Prepetition Credit Facility.  Since the Collateral Enforcement Action, there have been no funds held in the Debt Service Reserve Account. |
| **Landlord Collateral Account**<br>Account No. xxxxxxxx3246 | The Landlord Collateral Account is a money market account held by Fisker Automotive, Inc. at Citibank N.A.  The Landlord Collateral Account holds funds which are restricted pursuant to a letter of credit issued to secure the Debtors' obligations under the lease agreement for the Debtors' corporate headquarters in Anaheim, California.  The Debtors are not permitted to utilize the funds held in the Landlord Collateral Account to fund operations through the Cash Management System. |
| **DEDA Reserve Account**<br>Account No. xx-xx-xxx-xxx8786 | The DEDA Reserve Account is a reserve account held by Fisker Automotive, Inc. at PNC Bank.  The DEDA Reserve Account held restricted funds that were intended to ensure availability of cash to: (a) initially, pay a "Lien Forbearance Fee" that would be payable to secure a forbearance under the Debtors' prepetition secured credit facility with DEDA; and (b) upon DOE's determination in its sole discretion, pay other liabilities under the prepetition secured credit facility with DEDA.  The DEDA Reserve Account was created pursuant to and is governed by the Prepetition Credit Facility.  As of the date hereof, there were no funds held in the DEDA Reserve Account. |

DOCS_DE:190466.1 28353/001

**B.    Non-U.S. Bank Accounts**

18.    The Non-U.S. Bank Accounts are comprised of (a) one concentration account at Citi London (the "International Account") that, during normal course operations, serviced the Debtors' non-U.S. operations except for the operations of Fisker Automotive GmbH ("Fisker GmbH"), the Debtors' German subsidiary,[5] and (b) one concentration account at Commerzbank that, prior to the Petition Date, serviced the operations of Fisker GmbH, but as of the Petition Date held cash necessary to fund the solvent wind-down of Fisker GmbH (the "Fisker GmbH Account").[6] The International Account is held by Debtor Fisker Automotive, Inc. and the Fisker GmbH Account is held by Fisker GmbH. The Non-U.S. Bank Accounts are not subject to any deposit account control agreements in favor of the Debtors' prepetition secured lenders.

19.    The International Account is a concentration account maintained by Fisker Automotive, Inc. at Citi London. During normal course operations, the International Account collected funds via wire transfer generated by the Debtors' wholesale of vehicles to and other arrangements with international dealerships and distributers (other than those in Canada[7]), disbursed funds owed to international dealerships (other than Canadian), and paid other expenses related to international operations (other than Canadian operations and certain and the sales and marketing operations in Germany). Funds collected in the International Account stayed in that account unless manually disbursed by the Debtors for a dealer or other creditor payment or manually transferred, via foreign currency transaction, to the Central Concentration Account or

---

5    Fisker GmbH is not a debtor in these chapter 11 cases.

6    As of the Petition Date, the Fisker GmbH Account was not an active part of the Cash Management System and the Debtors are not seeking authority to make any postpetition intercompany transfers to Fisker GmbH.

7    Prior to the Petition Date, the Debtors maintained in international bank account at Citi London to service the Debtors' operations in Canada. The Debtors closed this bank account prior to the Petition Date.

the Fisker GmbH Account. As needed, the Debtors also funded international operations (other than Fisker GmbH operations) by causing funds to be transferred from the Central Concentration Account to the International Accounts also via foreign currency transactions.

20.    For a period prior to the Petition Date, the Debtors used the International Account as a concentration account to hold cash from prepetition fundings and cash generated from the sale of spare parts and used vehicle inventory in both the U.S. and abroad. Cash held in the International Account was distributed to fund the Debtors' global operations only with the permission of the Senior Secured Lender. To effectuate this system, the money collected in the Central Concentration Account from prepetition fundings and the sale of spare parts and used vehicle inventory in the U.S. was transferred from the Central Concentration Account to the International Account via foreign currency transaction. Funds from the sale of spare parts and used vehicle inventory outside the U.S. were also held in the International Account. As needed to fund U.S. operations and as approved by the Senior Secured Lender, cash would be transferred back to the Central Concentration Account via foreign currency transaction. In addition, a limited number of payments were made out of the International Account to fund certain international operations from funds transferred from the Central Concentration Account specific for these payments. As of the date hereof, the International Account had a zero balance.

### III.    Bank Fees

21.    In the ordinary course of business, the banks at which the Debtors maintain the Bank Accounts charge, and the Debtors pay, honor, or allow the deduction from the appropriate account, certain service charges and other fees, costs, and expenses (collectively, the "Bank Fees"). Historically, during normal course operations, the Debtors estimate that they paid approximately $8,000 in Bank Fees each month, depending on transaction volume. The Debtors estimate that there was approximately $1,750 in prepetition Bank Fees outstanding on the

11

Petition Date (the "Prepetition Bank Fees"). To maintain the integrity of their Cash Management System, the Debtors request authority to pay the Prepetition Bank Fees, in addition to any other prepetition Bank Fees for prepetition transactions that are charged postpetition, and to continue to pay the Bank Fees in the ordinary course of business postpetition. The Debtors also request that their banks be authorized to charge-back returned items to the Bank Accounts, whether such items are dated before, on, or subsequent to the Petition Date, in the ordinary course of business.

**Basis for Relief**

I.    **Maintaining the Existing Cash Management System Is Essential to Maximizing the Value of the Debtors' Estates**

22.    The Operating Guidelines and Reporting Requirements for Debtors in Possession and Trustees (the "U.S. Trustee Guidelines") require debtors in possession to, among other things: (a) establish one debtor in possession bank account for all estate monies required for the payment of taxes, including payroll taxes; (b) close all existing bank accounts and open new debtor in possession accounts; (c) maintain a separate debtor in possession account for cash collateral; and (d) obtain checks that bear the designation "debtor in possession" and reference the bankruptcy case number and type of account on such checks. These requirements are designed to provide a clear line of demarcation between prepetition and postpetition claims and payments and help protect against the inadvertent payment of prepetition claims by preventing banks from honoring checks drawn before the Petition Date.

23.    Considering, however, that, when fully operational, the Debtors' business and financial affairs are complex and require the collection, disbursement, and movement of funds through their various Bank Accounts, enforcement of this provision of the U.S. Trustee Guidelines during these chapter 11 cases would severely disrupt the Debtors' ordinary financial operations and, therefore, their ability to maximize estate value. Indeed, during normal course

12

operations, the Debtors utilized their Cash Management System, substantially in the structure illustrated on Exhibit 1 annexed to Exhibit A attached hereto, as a mainstay of their ordinary, usual, and essential business practices.  In addition, although the Debtors' current use of their cash management system is limited to the activities described herein, complying with the U.S. Trustee Guidelines would be unduly burdensome given the Debtors' limited resources. Furthermore, maintenance of the Cash Management System as it existed during normal course operations is essential to preserving value for the Debtors' stakeholders as it allows the Debtors' to operate their business in the ordinary course, without costly and distracting changes. Therefore, the Debtors respectfully request that the Court allow them to operate each of the Bank Accounts listed on Exhibit 2 annexed to Exhibit A attached hereto as they were maintained in the ordinary course of business before the Petition Date.

24.    The continuation of the Cash Management System is permitted pursuant to Section 363(c)(1) of the Bankruptcy Code, which authorizes the debtor in possession to "use property of the estate in the ordinary course of business without notice or a hearing." Additionally, courts in this and other districts have noted that an integrated cash management system "allows efficient utilization of cash resources and recognizes the impracticalities of maintaining separate cash accounts for the many different purposes that require cash." In re Columbia Gas Sys., Inc., 136 B.R. 930, 934 (Bankr. D. Del. 1992), aff'd in part and rev'd in part, 997 F.2d 1039 (3d Cir. 1993).  The United States Court of Appeals for the Third Circuit has agreed, emphasizing that requiring a debtor to maintain separate accounts "would be a huge administrative burden and economically inefficient."  Columbia Gas, 997 F.2d at 1061; see also In re Southmark Corp., 49 F.3d 1111, 1114 (5th Cir. 1995) (noting that maintaining existing cash

management system allows debtors "to administer more efficiently and effectively its financial operations and assets").

## II.    Maintaining the Existing Cash Management System Will Not Harm Parties in Interest

25.    The Debtors' continued use of their Cash Management System will facilitate the Debtors' transition into chapter 11 by, among other things, avoiding administrative inefficiencies, expenses, and distraction associated with disrupting this system and minimizing delays in the payment of postpetition obligations. The Debtors respectfully submit that parties in interest will not be harmed by the Debtors' maintenance of their existing Cash Management System, including maintenance of the Bank Accounts, because the Debtors have implemented appropriate mechanisms to ensure that unauthorized payments will not be made on account of obligations incurred before the Petition Date. Specifically, with the assistance of their advisors, the Debtors have implemented internal control procedures that prohibit payments on account of prepetition debts without the prior approval of the Debtors' treasury department. In light of such protective measures, the Debtors submit that maintaining the Cash Management System is in the best interests of their estates and creditors.

## III.    Authorizing the Debtors to Continue Using Debit, Wire, and ACH Transfers Is Warranted

26.    The Debtors request that the Court grant further relief from the U.S. Trustee Guidelines to the extent they require the Debtors to make all disbursements by check. In particular, the U.S. Trustee Guidelines require that all receipts and all disbursements of estate funds must be made by check with a notation representing the reason for the disbursement. As discussed above, during normal course operations, the Debtors conducted transactions through ACH transfers and other similar methods. If the Debtors' ability to conduct transactions by debit, wire, ACH transfer, or other similar methods is impaired, the Cash Management System

14

may not function normally which would impair the Debtors' ability to preserve value for their estates and stakeholders.

## IV. Authorizing the Banks to Continue to Maintain, Service, and Administer the Bank Accounts in the Ordinary Course of Business Is Warranted

27.     As discussed above, implementing the U.S. Trustee Guidelines would be unduly burdensome given the Debtors' limited resources and would impair the Debtors' efforts to preserve and maximize the value of their estates.  Thus, the Debtors respectfully request that the Court authorize the banks to continue to maintain, service, and administer the Bank Accounts as accounts of the Debtors as debtors in possession, without interruption and in the ordinary course of business.  In this regard, the banks should be authorized to receive, process, honor, and pay any and all checks, ACH transfers, and other instructions, and drafts payable through, drawn, or directed on such Bank Accounts after the Petition Date by holders, makers, or other parties entitled to issue instructions with respect thereto; provided, however, that any check, draft, or other notification that the Debtors advise the banks to have been drawn, issued, or otherwise presented before the Petition Date may be honored by the banks only to the extent authorized by order of the Court.

28.     The Debtors further request that the Court authorize the banks to accept and honor all representations from the Debtors as to which checks, drafts, wires, or ACH transfers should be honored or dishonored consistent with any order of the Court and governing law, whether such checks, drafts, wires, or ACH transfers are dated before or subsequent to the Petition Date.  The Debtors also request that, to the extent a bank honors a prepetition check or other item drawn on any account either:  (a) at the direction of the Debtors or (b) in a good-faith belief that the Court has authorized such prepetition check or item to be honored, such bank will not be deemed to be liable to the Debtors or to their estates on account of such prepetition check or

15

other item honored postpetition.  The Debtors respectfully submit that such relief is reasonable and appropriate because the banks are not in a position to independently verify or audit whether a particular item may be paid in accordance with a Court order or otherwise.

29.     Moreover, the Debtors request that the Court authorize the Debtors to pay the Prepetition Bank Fees, in addition to any other prepetition Bank Fees for prepetition transactions that are charged postpetition, and authorize the banks to (a) continue to charge the Debtors the Bank Fees and (b) charge-back returned items to the Bank Accounts, whether such items are dated before, on, or subsequent to the Petition Date, in the ordinary course of business.

30.     In other similarly-sized chapter 11 cases, courts in this district have regularly waived the U.S. Trustee Guidelines on the grounds that they are impractical and potentially detrimental to a debtor's restructuring efforts.  See, e.g., In re Physiotherapy Holdings, Inc., No. 13-12965 (KG) (Bankr. D. Del. Nov. 14, 2013) (authorizing debtors' continued use of cash management system and bank accounts on a final basis); In re Dex One Corp., No. 13-10533 (KG) (Bankr. D. Del. Mar. 19, 2013) (same, final order); In re Conexant Sys., Inc., No. 13-10367 (MFW) (Bankr. D. Del. Apr. 11, 2013) (same); In re Buffets Rests. Holdings, Inc., No. 12-10237 (MFW) (Bankr. D. Del. Jan. 19, 2012) (same); In re LTAP US, LLLP, No. 10-14125 (KG) (Bankr. D. Del. Jan. 28, 2011) (same); In re U.S. Concrete, Inc., No. 10-11407 (PJW) (Bankr. D. Del. Apr. 30, 2010) (same).[8]

## V.    The Court Should Authorize the Debtors to Continue Using Their Existing Business Forms

31.     To avoid disruption of the Cash Management System and unnecessary expense, pursuant to Local Rule 2015-2(a), the Debtors request that they be authorized to continue to use

---

[8]  Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request of the Debtors' proposed counsel.

their business forms substantially in the form existing immediately before the Petition Date, without reference to their status as debtors in possession. The Debtors submit that parties in interest will not be prejudiced if the Debtors are authorized to continue to use their business forms substantially in the forms existing immediately before the Petition Date because parties doing business with the Debtors undoubtedly will be aware of their status as debtors in possession and, thus, changing business forms is unnecessary and would be unduly burdensome. In accordance with Local Rule 2015-2(a), once the Debtors have exhausted their existing supply of business forms, the Debtors will reorder business forms with the designation "Debtor in Possession" and the corresponding bankruptcy number on all such forms (including checks).

32.    In other comparably sized chapter 11 cases, courts in this district have allowed debtors to use their prepetition business forms without the "debtor in possession" label. See, e.g., In re Physiotherapy Holdings, Inc., No. 13-12965 (KG) (Bankr. D. Del. Nov. 14, 2013) (authorizing continued use of business forms on a final basis); In re Dex One Corp., No. 13-10533 (KG) (Bankr. D. Del. Mar. 19, 2013) (same, final order); In re Conexant Sys., Inc., No. 13-10367 (MFW) (Bankr. D. Del. Apr. 11, 2013) (same); In re Buffets Rests. Holdings, Inc., No. 12-10237 (MFW) (Bankr. D. Del. Jan. 19, 2012) (same); In re LTAP US, LLLP, No. 10-14125 (KG) (Bankr. D. Del. Jan. 28, 2011) (same).

## VI.    Cause Exists for Waiving the Investment and Deposit Guidelines Under Section 345 of the Bankruptcy Code

33.    As noted above, the Debtors maintain certain funds in an interest-bearing money market account to collateralize a letter of credit issued to secure the Debtors' obligations under the lease for the Debtors' corporate headquarters in Anaheim, California. The Debtors request the authority to continue to hold cash in this account, even if the Debtors' investment practices do not strictly adhere to the requirements of section 345(b) of the Bankruptcy Code.

17

34.     Section 345(a) of the Bankruptcy Code authorizes the deposit or investment of money of the estate, such as cash, as "will yield the maximum reasonable net return on such money, taking into account the safety of such deposit or investment." 11 U.S.C. § 345(a). Although section 345(b) of the Bankruptcy Code generally requires that, with respect to investments other than investments "insured or guaranteed by the United States or by a department, agency or instrumentality of the United States or backed by the full faith and credit of the United States," the estate must require a bond in favor of the United States secured by the undertaking of a U.S. Trustee approved corporate surety, the court is permitted to dispense with this undertaking for "cause." 11 U.S.C. § 345(b).

35.     The Court's ability to excuse strict performance of the deposit and investment requirements of section 345(b) of the Bankruptcy Code for "cause" arises from the 1994 amendment to the Bankruptcy Code.  The legislative history of that amendment provides as follows:

> Section 345 of the Code governs investments of funds of bankruptcy estates.  The purpose is to make sure that funds of a bankrupt (sic) that are obliged to creditors are invested prudently and safely with the eventual goal of being able to satisfy all claims against the bankruptcy estate.  Under current law, all investments are required to be FDIC insured, collateralized or bonded. While this requirement is wise in the case of smaller debtors with limited funds that cannot afford a risky investment to be lost, it can work to needlessly handcuff larger, more sophisticated debtors.  This section would amend the Code to allow the courts to approve investments other than those permitted by section 345(b) for just cause, thereby overruling In re Columbia Gas Sys., Inc., 33 F.3d 294 (3d Cir. 1994).

In re Serv. Merch. Co., 240 B.R. 894, 896 (Bankr. M.D. Tenn. 1999) (emphasis original) (quoting 140 Cong. Rec. H10767 (daily ed. Oct. 4, 1994)).

36.     In determining whether "cause" under section 345(b) of the Bankruptcy Code exists, the Court should consider a "totality of the circumstances analysis," using the following factors:

a.      the sophistication of the debtor's business;

b.      the size of the debtor's business operations;

c.      the amount of the investments involved;

d.      the bank ratings, e.g., ratings of Moody's Investor Service, Inc. ("Moody's") and Standard & Poor's Financial Services LLC ("Standard & Poor's"), of the financial institutions where the debtor in possession funds are held;

e.      the complexity of the case;

f.      the safeguards in place within the debtor's own business of insuring the safety of the funds;

g.      the debtor's ability to reorganize in the face of a failure of one or more of the financial institutions;

h.      the benefit to the debtor;

i.      the harm, if any, to the estate; and

j.      the reasonableness of the debtor's request for relief from section 345(b) requirements in light of the overall circumstances of the case.

Serv. Merch., 240 B.R. at 896.

37.     Cause exists here to waive the requirements under section 345(b) of the Bankruptcy Code. First, the Debtors hold the invested funds at a reputable banking institution, Citibank N.A., which has received "investment grade" debt ratings from Fitch Ratings, Moody's, and Standard & Poor's. Therefore, the Debtors' limited investment practices, involving the investment of collateral funds in a single money market account, are prudent. Second, no party in interest is prejudiced by the waiver of the requirements of section 345(b) of the Bankruptcy Code because the funds held in the money market account are restricted from use in the Debtors' Cash Management System as they are held as collateral for a letter of credit. Third, requiring the Debtors to modify their limited investment practices to strictly adhere to the restrictions established by section 345(b) of the Bankruptcy Code will distract management from other,

19

pressing aspects of these chapter 11 cases, slow the Debtors' momentum, and cause the estates to incur unnecessary costs to the detriment of stakeholders and the Debtors' estate.

38.     In other comparably-sized chapter 11 cases, courts in this jurisdiction have found that cause exists to excuse compliance with the requirements of section 345(b) of the Bankruptcy Code.  See, e.g., In re Dex One Corp., No. 13-10533 (KG) (Bankr. D. Del. Mar. 19, 2013) (waiving on an interim basis the requirements of section 345(b) with respect to investment practices); In re Buffets Rests. Holdings, Inc., No. 12-10237 (MFW) (Bankr. D. Del. Jan. 19, 2012) (same); In re Amicus Wind Down Corp. (f/k/a Friendly Ice Cream Corp.), No. 11-13167 (KG) (Bankr. D. Del. Oct. 6, 2011) (same); In re Neb. Book Co., No. 11-12005 (PJW) (Bankr. D. Del. June 28, 2011) (same); In re LTAP US, LLLP, No. 10-14125 (KG) (Bankr. D. Del. Jan. 28, 2011) (same).

39.     Local Rule 2015-2(b) provides that "if a motion for [a waiver of the investment requirements of section 345 of the Bankruptcy Code] is filed on the first day of a chapter 11 case in which there are more than 200 creditors, the Court may grant an interim waiver until a hearing on the debtor's motion can be held."  There are over 500 creditors in these chapter 11 cases per the Debtors' books and records.  Therefore, in accordance with Local Rule 2015-2(b), the Debtors request an interim waiver of the requirements of section 345 of the Bankruptcy Code until a final hearing on the Debtors' request for waiver of such requirements can be held.

### The Requirements of Bankruptcy Rule 6003(b) Are Satisfied

40.     Bankruptcy Rule 6003(b) empowers a court to grant relief within the first 21 days after the Petition Date "to the extent that relief is necessary to avoid immediate and irreparable harm." Fed. R. Bankr. P. 6003(b).  Because of the Debtors' need to maximize estate value, any disruption to the Cash Management System would seriously harm the Debtors and their estates. Indeed, without the Cash Management System, payments may not be made in a timely fashion,

and the Debtors would be unable to track incoming receipts. This would likely result a diminution in the value of the Debtors' estates to the detriment of all parties in interest and, thus, result in immediate and irreparable harm. Accordingly, the Debtors meet the "immediate and irreparable harm" standard of Bankruptcy Rule 6003(b).

**Satisfaction of Bankruptcy Rules 6004(a) and 6004(h)**

41. To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

**Notice**

42. Notice of this Motion shall be provided to: (a) the Office of the United States Trustee for the District of Delaware; (b) the entities listed on the Consolidated List of Creditors Holding the 35 Largest Unsecured Claims; (c) counsel to PNC Bank, N.A., d/b/a Midland Loan Services, a division of PNC Bank, N.A., as successor by merger to Midland Loan Services, Inc., as collateral agent under that certain Amended and Restated Collateral Agency Agreement dated as of July 30, 2010; (d) the Internal Revenue Service; (e) the United States Department of Energy; (f) Silicon Valley Bank; (g) the Delaware Economic Development Authority; (h) counsel to the United States Department of Energy; (i) counsel to Hybrid Technology, LLC; (j) counsel to Hybrid Tech Holdings, LLC; (k) any party that has requested notice pursuant to Bankruptcy Rule 2002; and (l) any banks at which the Debtors maintain the Bank Accounts, including Citibank N.A., Silicon Valley Bank, PNC Bank, Citi London, and Commerzbank. As this Motion is seeking "first day" relief, within two (2) business days of the hearing on this Motion, the Debtors will cause this Motion and any order entered with respect to this Motion to be served in accordance with Local Rule 9013-1(m).

21

**No Prior Request**

43.     No prior motion for the relief requested herein has been made to this or any other

court.


[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

DOCS_DE:190466.1 28353/001

WHEREFORE, for the reasons set forth herein, the Debtors respectfully request that the Court enter the Interim and Final Orders, substantially in the forms attached hereto as Exhibit A and Exhibit B, respectively, granting the relief requested herein and such other and further relief as the Court deems appropriate.

Dated:  November 22, 2013
       Wilmington, Delaware

*/s/ Laura Davis Jones*
Laura Davis Jones (DE Bar No. 2436)
James E. O'Neill (DE Bar No. 4042)
Peter J. Keane (DE Bar No. 5503)
**PACHULSKI STANG ZIEHL & JONES LLP**
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone:    (302) 652-4100
Facsimile:    (302) 652-4400
Email:    ljones@pszjlaw.com
       joneill@pszjlaw.com
       pkeane@pszjlaw.com

- and -

James H.M. Sprayregen, P.C. (pro hac vice pending)
Anup Sathy, P.C. (pro hac vice pending)
Ryan Preston Dahl (pro hac vice pending)
**KIRKLAND & ELLIS LLP**
300 North LaSalle Street
Chicago, Illinois  60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:    james.sprayregen@kirkland.com
       anup.sathy@kirkland.com
       ryan.dahl@kirkland.com

Proposed Attorneys for the
Debtors and Debtors in Possession