## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| FAH LIQUIDATING CORP. (f/k/a FISKER | ) | Case No. 13-13087 (KG) |
| AUTOMOTIVE HOLDINGS, INC) *et al.*, | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | |
| | ) | **Re: Dkt. No. 1215** |

## OPINION

## INTRODUCTION

The professionals for the Official Committee of Unsecured Creditors (the "Committee") (consisting of Brown Rudnick LLP, Saul Ewing LLP, and Emerald Capital Advisors Corporation, collectively the "Professionals") have asked the Court to allow their request for a fee enhancement and related fees. Hybrid Tech Holdings, LLC ("Hybrid") and the United States Trustee have filed objections. The below chart shows the aggregate fees, the enhancement requested, and the percentage enhancement requested by the Professionals. Saul Ewing and Brown Rudnick are also seeking compensation for their time spent requesting the fee enhancement.

| Professionals | *Aggregate Fees* | Enhancement | Percentage Enhancement |
|---|---|---|---|
| Brown Rudnick | $3,337,694.50 | $1,744,876.00 | 52.3% |
| Saul Ewing | $303,180.50 | $172,151.50 | 56.8% |
| Emerald | $997,925.00 | $572,300.00 | 57.3% |
| **TOTALS** | **$4,638,800.00** | **$2,489,327.50** | **53.7%** |

The Court recognizes that the Professionals ably represented the Committee and the other unsecured creditors, for which the Professionals fairly received considerable compensation. The Court does not intend anything in this Opinion to minimize its respect for the Professionals' work. The fact remains, however, that the requested fee enhancements, if allowed, would result in excessive compensation. The Court will therefore deny the requests.

## JURISDICTION

The Court has jurisdiction over this matter and the judicial authority to issue a final order pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b).

## BACKGROUND

A complete recitation of the events leading up to the petition date and the history of this bankruptcy case itself is not necessary to the resolution of the matter before the Court, which turns on a relatively narrow set of facts.[1] A summary of the salient facts will suffice. The Debtors[2] were founded in 2007, with the goal of designing, assembling, and manufacturing premium plug-in hybrid electric vehicles ("PHEV's") in the United States. Debtors faced many difficulties that prevented them from operating as planned. The challenges included safety recalls related to battery packs supplied by a third party vendor (notably, A123 Systems Inc.), the loss of a material portion of their existing unsold

---

[1] For a full recitation of the facts see *In re Fisker Automotive Holdings, Inc., et. al.*, 510 B.R. 55 (Bankr. Del. 2014).

[2] The Debtors are Fisker Automotive Holdings, Inc. and Fisker Automotive, Inc.

vehicle inventory in the United States during Hurricane Sandy in 2012, and the loss of their lending facility provided through the United States Department of Energy ("DOE").

## A.    Department of Energy Auction

Debtors and the United States of America, through DOE, were parties to a Loan Arrangement and Reimbursement Agreement, dated as of April 22, 2010 (as amended, supplemented or otherwise modified, "Senior Loan Agreement"). Pursuant to the Senior Loan Agreement, DOE agreed to: (a) arrange for the Federal Financing Bank ("FFB") to purchase notes from Fisker in an amount not to exceed $169.3 million to fund the development, commercial production, sale and marketing, and all related engineering integration of the Debtors' "Karma" PHEV; and (b) arrange for FFB to purchase notes from Fisker in an amount not to exceed $359.4 million to fund the development, commercial production, sale and marketing of the Debtors' "Nina" PHEV, a moderately priced version of the Karma, including the construction of a production site in the United States.

On October 11, 2013, in an auction, Hybrid purchased DOE's position of outstanding principal of $168.5 million ($.15/$1.00) under the Senior Loan Facility for $25 million and, for all practicable purposes, succeeded to DOE's position as the Debtors' senior secured lender, although it was undetermined how much of the $168.5 million was secured.    With the Senior Loan sale by DOE to Hybrid, the Debtors entered into discussions with Hybrid regarding Hybrid's potential acquisition of the Debtors' assets through bankruptcy by a credit bid for all or part of the Senior Loan.    These discussions led to the Asset Purchase Agreement, pursuant to which Hybrid proposed to acquire

substantially all of Debtors' assets for consideration which included $25 million in the form of a credit bid. The Debtors concluded that a sale to a third party other than Hybrid was not reasonably likely to generate greater value than the Debtors' proposed sale transaction, or advisable under the facts and circumstances of these chapter 11 cases. The DOE loan purchase made Hybrid the Debtors' senior secured lender, holding approximately $168.5 million in claims.

B.    Bankruptcy Filing and Plan for a Private Sale

Following an 18-month period of operational dormancy, the Debtors filed these cases on November 22, 2013 (the "Petition Date") to accomplish the sale of substantially all of their assets to Hybrid and then to administer these chapter 11 estates through the Debtors' proposed chapter 11 plan of liquidation.  The Debtors decided that the cost and delay arising from a competitive auction process or pursuing a potential transaction with an entity other than Hybrid would be reasonably unlikely to increase value for the estates. The Sale Motion therefore reflected Debtors' decision to sell its assets to Hybrid through a private sale.  As of the Petition Date, the Debtors had approximately $203.2 million in indebtedness and related obligations outstanding.

As stated above, prior to the Petition Date Hybrid acquired DOE's senior secured loan to Fisker after Fisker and its advisors had marketed its assets extensively, to no avail. On the Petition Date, Fisker filed motions to enable Hybrid to acquire the assets of Fisker as a going concern, including a motion to approve bidding procedures, the sale of Fisker's assets to Hybrid, a proposed liquidating plan of reorganization and accompanying disclosure statement, and a motion to authorize debtor-in-possession lending by an

affiliate of Hybrid to finance Fisker's bankruptcy through confirmation.  The case was to proceed on a highly expedited schedule during the Thanksgiving through New Year's holiday season.

> ## C.     Appointment of the Committee and the Committee's Efforts

The Committee was formed on December 5, 2013 and selected Brown Rudnick, Saul Ewing, and Emerald Capital Advisors Corporation as Committee Professionals.  The professionals filed retention applications in January of 2014 [D.I. 331, 332, & 355].  The Court approved the retention of the Professionals under Section 328(a) of the Bankruptcy Code [D.I. 551, 570, & 571].  Upon the Court's approval of the retentions, Fisker began depositing funds into an escrow account held by Brown Rudnick on behalf of all the Professionals to guard against the risk of nonpayment.

The Professionals did everything that the Court would expect of them in a case of this size and complexity.  The Professionals on behalf of the Committee promptly undertook an investigation, obtained numerous documents from Fisker, and interviewed potential witnesses.  On December 30, 2014, the Committee, through the Professionals, filed a motion for standing to sue Hybrid and objected to the allowance of Hybrid's claims alleging various causes of action, including disputes as to the DOE's perfection of liens over Fisker's international patent rights.  The Committee also requested a competitive auction for Fisker's assets and moved to cap Hybrid's right to credit bid under Section 363(k) of the Bankruptcy Code.

The Professionals argued that there was cause to cap Hybrid's credit bid because the validity of the liens on a portion of the assets to be sold were disputed.  Wanxiang

America Corporation ("Wanxiang") had, through the Professional's efforts,[3] re-emerged as an interested party wishing to bid at the auction if credit bidding was capped. The Professionals negotiated an agreement with Debtors providing that not all of Hybrid's claim was secured and that capping Hybrid's credit bid would result in competitive bidding for Debtors' assets.  The Court held that these facts constituted cause to limit Hybrid's right to credit bid and ordered that the Debtors hold an open auction.  Hybrid and Wanxiang were designated as co-stalking horses for the purpose of the auction, and no other bidder participated.  The auction date was set for and began on February 12, 2014, and lasted through February 14, 2014.  These efforts resulted in Wanxiang as the winning bidder, with a cash purchase price rather than Hybrid's credit bid.

The Court knows that the Professionals worked within an abbreviated timeframe. The compressed schedule was, at least in part, the Committee's choice.  The Court pointedly asked counsel for the Committee if they needed more time, but the Committee declined the suggestion.

## DISCUSSION

A.    Bankruptcy Code Sections 327, 328, and 330(a)

The starting points for an analysis of fee enhancements are Sections 327, 328, and 330(a) of the Bankruptcy Code.  Sections 327 and 328 of the Code authorize debtors-in-possession, trustees, and committees to employ attorneys and other professionals on

---

[3] The Professionals represented the Unsecured Creditors Committee in *In re A123 Systems, Inc.*, Case No. 12-12859 ("*A123*"), in which Wanxiang purchased all of A123's assets.  The assets included the battery used in the Fisker automobiles. Wanxiang was therefore a highly motivated purchaser.  Wanxiang had been a bidder for Fisker's debt in the DOE auction.

reasonable terms and conditions of employment. These terms of employment may include the payment of a retainer and the payment of fees on either an hourly or contingent basis. Under Section 328, "the court may allow compensation different from the compensation provided under such terms and conditions after the conclusion of such employment, if such terms and conditions prove to have been improvident in light of developments not capable of being anticipated at the time of the fixing of such terms and conditions." 11 U.S.C. § 328(a). Thus, Section 328(a) "operates as a two way ratchet: it may preclude reduction of compensation that in hindsight appears excessive, but it also may preclude an increase of compensation that in hindsight appears inadequate." 3 Collier on Bankruptcy 328.03[4][b] at 328-30 (2014).

Section 330(a) governs the payment of fees to estate professionals. The purpose of Ssection 330 is first to ensure that compensation is reasonable, and second, that lawyers are not deterred from taking bankruptcy cases because consideration is inadequate. *In re UNR Indus. Inc.*, 986 F.2d 207, 209-10 (7th Cir. 1993). Bankruptcy courts have typically analyzed Section 330 as a fee-shifting statute, and Supreme Court and other precedents involving fee-shifting statutes have been widely applied to requests for fee enhancements in bankruptcy. *Id.*

### B.    Early Fee-Shifting Standards

The benchmark for an award under Section 330 is that the fee must be reasonable. *Pennsylvania v. Delaware Valley Citizens' Counsel for Clean Air*, 478 U.S. 546, 562 (1986). The first widely used measures of reasonableness were developed by the Fifth Circuit in *Johnson v. Georgia Highway Express*, 448 F.2d 714 (5th Cir. 1974). Under the *Johnson* test,

courts consider 12 factors in determining the reasonableness of a fee, including: (1) the time and labor required; (2) the novelty and difficulty of the question; (3) the skill required to perform the legal service; (4) the preclusion of other employment by the attorney; (5) the customary fee; (6) the fixed or contingent nature of the fee; (7) the time limitations imposed by the client or circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorney; (10) the undesirability of the case; (11) the nature and length of the professional relationship; and (12) awards in similar cases. *Id.* at 717-19. However, the Supreme Court has criticized these factors as placing "unlimited discretion in the trial court and produc[ing] disparate results." *Pennsylvania v. Delaware Valley Citizens' Counsel for Clean Air*, 478 U.S. 546, 562 (1986).

The Third Circuit developed an alternative test for determining the reasonableness of fee awards under fee-shifting statutes in *Lindy Bros. Builders Inc. v. American Radiator & Standard Sanitary Corp.*, 487 F.2d 161, 167 (3d Cir. 1973). Under this approach, the number of hours expended on a case is multiplied by a reasonable hourly rate of compensation, and then using this "lodestar" amount as a starting point, a court may adjust fees based on (1) the contingent nature of the case, specifically, the investment of hours and expenses without any assurance of compensation; and (2) the quality of work performed, as evidenced by the nature and complexity of the issues and the recovery obtained. *Merola v. Atlantic Richfieldl Co.*, 515 F. 2d 165, 168 (3d Cir.1975).

C.    Fee Enhancements in Bankruptcy

It is generally accepted that certain bankruptcy cases warrant a reconsideration and upward adjustment of the lodestar.  For example, the Fifth Circuit affords bankruptcy courts the discretion to enhance an attorney's fees in the rare and exceptional case where counsel accomplishes a substantial recovery for the client that would not have otherwise occurred without his or her efforts. *CRG Partners Grp., LLC v. Neary (In re Pilgrim's Pride Corp.)*, 690 F.3d 650, 652-53, 666 (5th Cir. 2012) (affirming a fee enhancement for a chief restructuring officer of 16 percent).  These cases allow a court to reconsider the *Johnson* factors, which the Supreme Court has determined are included in the lodestar calculation. *In re El Paso Refinery, L.P.*, 257 B.R. 809, 827 (Bankr. W.D. Tex. 2000).  Thus, bankruptcy courts still look to the end result to define whether a case was rare and exceptional.

Performance warranting a fee enhancement is most evident when all creditors receive full recovery.  For example, the court in *In re Nucentrix Broadband Networks, Inc.* 314 B.R. 574, 579 (Bankr. N.D. Tex. 2004) awarded a ten percent fee enhancement under Section 330 to counsel for the debtor-in-possession after the confirmed plan provided 100 percent distribution for all creditors and a return to equity. There, creditors had originally expected twelve cents on the dollar, and thus no return to equity; however, "exceptional legal representation and advice . . . led to the Debtors' receiving a bid over three times the original stalking horse bid." *Id.* at 577.  Similarly, in *In re Farah*, 141 B.R. 920 (W.D. Tex. 1992) debtors' counsel received a fee enhancement of double the lodestar amount for turning a case expected to have produced a five percent distribution into one in which all

creditors were paid in full, and the debtor emerged from bankruptcy with substantial assets. Recently, the court in *In the Matter of ASARCO, L.L.C.* addressed the issue of fee enhancements for a financial advisor to the chapter 11 debtor. 702 F.3d 250 (5th Cir. 2012). There, the bankruptcy court analyzed the fee enhancement under Section 328(a) because the engagement agreement specifically provided that fees were to be analyzed under Section 328 and not under Section 330. *Id.* at 267-268. The *ASARCO* court stated that under Section 328, a "professional may be retained on reasonable terms; but, once those terms have been approved pursuant to § 328(a), the court may not stray from them at the end of the engagement unless developments subsequent to the original approval that were incapable of being anticipated render the terms improvident." *Id.* at 257. "Such a movant must show not merely that a compensation adjustment is appropriate in light of subsequent developments that were previously unseen or unanticipated by the parties; instead, the movant is tasked with the weightier burden of proving that the subsequent developments were incapable of being anticipated at the time the engagement was approved." *Id.* at 258. "In disputes governed by § 328(a), the contractual agreement is supreme, and we shall enforce the contract as written." *Id.* at 268.

In *ASARCO*, applying the above standards to the facts of the case, the court of appeals reversed the bankruptcy court's ruling because none of the facts upon which the enhancement was based satisfied the exceptions of Section 328. *Id.* at 263-64. Although the asset sale took longer than expected, the additional services performed were capable of being anticipated and, therefore, failed to qualify for enhancement under Section 328. (*Id.* at 264). The court of appeals noted that the prospect of prolonged litigation always

exists, and is not an adequate basis for an enhancement under Section 328. *Id.* at 265. In sum, the developments in the bankruptcy proceeding were capable of being anticipated within the meaning under Section 328, and the court of appeals concluded that the fee enhancement was not warranted.

Courts in Delaware have also addressed this issue. In *In re Covad Communications Group, Inc.*, 292 B.R. 31 (D. Del. 2003) counsel to the debtors guided the company "through a successful Chapter 11 reorganization involving approximately three billion dollars in claims by virtue of a reasonable cash payment and minimal dilution of equity resulting in a consensual plan of reorganization." There, the debtor was "facing certain failure." (*Id.* at 32). Counsel guided the company through reorganization that provided various constituencies with substantial recovery. Specifically, the court stated "that the requested enhancement is warranted by virtue of the witness testimony presented at the hearing, the circumstances of Covad's reorganization, the lack of objection by interested constituencies, and the Court's assessment of the results achieved by virtue of the skill and expertise [of the debtor's attorneys]." *Id.* The District Court awarded debtors' counsel a fee enhancement under Section 330 of $1 million and an option to purchase equity of the reorganized debtor. *Id.*

More recently, in *In re Uni-Marts, LLC, et. al.*, a fee enhancement was granted to the investment banker who sold the debtor's business. 2010 WL 1347640 (Bankr. D. Del. March 31, 2010). There, the investment banker sought a fee enhancement of almost $100,000. No party objected. The original sale in the case was not completed, forcing the investment banker search for buyers. The investment banker contacted over 3,000

prospects and responded to over 300 due diligence requests before conducting an auction

and reviewing over 100 bids.  These efforts resulted in a sale price of $2.2 million over the

original price.  In analyzing the fee enhancement, the court looked to the factors set forth

in Section 330 of the Code, including:

> (A) the time spent on such services; (B) the rates charged for such services; (C) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title; (D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed; (E) with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; and (F) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

*Id.*

After analyzing each factor, the court determined that the fee enhancement was

warranted.  Interestingly, the court stated:

> "The Court was initially reluctant to even consider the fee enhancement request of Matrix. Since investment bankers typically are compensated on a percentage basis, the Court felt that Matrix should bear the risk of a lower compensation if the sale was not a success, just as it would have reaped the reward if the sale was wildly successful. The support of the Debtors and the Creditors' Committee was a major factor in the Court agreeing to consider the enhanced fee request. It is also significant that no party in interest filed any objection to the fee enhancement. After reviewing the request under the standards of section 330(a) and based on the rather unique circumstances of this case, where Matrix had to conduct a second marketing effort and auction, the Court is satisfied that the fee enhancement request should be granted."

*Id.*

### D.    <u>Application to Fisker</u>

The Professionals argue that they are entitled to a fee enhancement because they

undertook significant risk of nonpayment of services and overcame considerable odds in

the sale.  The Professionals argue that at the commencement of the case, unsecured creditors were expected to receive little or no return, but because of the substantial contributions of the Professionals, the general unsecured creditors received $40-50 million in value after Hybrid received $100 million.  The Professionals conducted their own marketing process that resulted in locating the eventual purchaser and securing alternative DIP financing on a subordinated basis.  The Committee believes that the factors in Section 330 weigh in favor of a fee enhancement, as the Committee's professionals were in danger of nonpayment and there was real concern that the estate would be administratively insolvent.  Additionally, the Professionals assert that they created an exceptional result, namely, the substantial increase in the sale proceeds. Finally, the Professionals indicate that they obtained these results in a very compressed time frame of barely 60 days.

The United States Trustee ("UST") objects to the fee enhancement, arguing that the results of the case were not rare and exceptional because the general unsecured creditors are not receiving full recovery.  Allowed unsecured claims are receiving $.40 on the dollar.  The UST argues that the risk undertaken by the Professionals was no different or greater than the risk taken by professionals in other cases where unsecured creditors may be out of the money.  The UST also points out that the Professionals insisted on full market rates when they were retained under Section 328.  The UST argues that the Professionals were simply performing the job that they were hired to do.

Hybrid, which agreed to pay the Professionals' fees,[4] also filed an objection to the fee enhancement, asserting that the Professionals are wrongly taking sole credit for Fisker's success.  According to Hybrid, a collaborative effort resulted in the improved results for Fisker's creditors.  Hybrid argues that the Court should deny the request for a fee enhancement as a matter of law because the applicants do not even attempt to meet the standards required under Section 328(a) of the Bankruptcy Code.  Hybrid observes that the Professionals were retained under Section 328 and not Section 330, and thus Section 330 is inapplicable.  Similar to the UST's objection, Hybrid asserts that the applicants' risk of non-payment does not warrant a fee enhancement.  Procedurally, Hybrid also asserts that the applicants cannot request a substantial contribution claim of $46,000 because they missed the administrative bar date of September 12, 2014.  Finally, Hybrid argues that Brown Rudnick inappropriately billed $53,533.00 for research and writing related to the request for a fee enhancement as well as inappropriately billing $99,966.50 for work related to the liquidating trust.

The Court finds that the Professionals are not entitled to a fee enhancement under Section 328(a) of the Bankruptcy Code.  As stated above, under Section 328(a) a fee arrangement may only be altered if such terms and conditions prove to have been improvident in light of developments not capable of being anticipated at the time of retention.  Both the Second and Fifth Circuit Courts have remarked that Section 328

---

[4]  Hybrid also complains that the Professionals are guilty of a "bait and switch" by not disclosing their intention to seek a fee enhancement in the negotiations that led to Hybrid's agreement to pay the fees. The Court's ruling that the Professionals are not entitled to a fee enhancement obviates the need to address this issue.

creates a "high hurdle" for a movant seeking to revise the terms governing a professional's compensation. *ASARCO,* 702 F.3d at 258; *In re Smart World Techs., LLC,* 552 F.3d 228. 234-35 (2d. Cir. 2009).   Importantly, the Court notes the differences between Sections 328 and 330.   Namely, that under Section 328 "professionals may avoid subjecting their fees to the inherent uncertainty associated with such court discretion § 328(a) by obtaining prior approval of their fee arrangements under section 328(a) . . . . In so doing, however, professionals must accept the tradeoff presented by § 328(a). That section's certainty and predictability come at the expense of flexibility: The professionals would be underpaid if their engagements should require more work than they had initially expected." *ASARCO,* 702 F.3d at 261.  The court of appeals also cites to and quotes from *In re Nucentrix Broadband Networks, Inc.,* 314 B.R. 574, 580-81 (N.D. Tex. 2004) ("[I]f a firm obtains the protection of Section 328, the firm and the Court must live with the conditions of that Section.")

There is nothing in the record to support a fee enhancement under Section 328. There is no evidence that the amount of work required was unexpected.  Rather, the Professionals were involved in the case prior to their appointment.  The timing of the auction and the abbreviated timeframe of the case were expected from the outset, and the Professionals did not ask for any extensions of time despite invitations to do so from the Court.  The Professionals did not have to look far to attract Wanxiang as a bidder, since they represented the Committee in *A123,* where Wanxiang was the successful bidder for the battery which Debtors' automobiles used.  Wanxiang was also a bidder in the DOE auction.  The Professionals' contribution, while laudatory, was hardly the result of an

arduous undertaking.  *Compare* the Professionals' effort here with the investment

banker's work in *Covad*, *supra*.  Further, the results obtained, while better than expected,

are not as extraordinary as illustrated by the above cases.  Here, the unsecured creditors

are only receiving a forty percent recovery.  The cases which the Court has discussed

demonstrate that the vast majority of cases which approve an enhancement provide a full

recovery for creditors, and some even provide additional returns to equity. While the case

at bar did achieve a better than expected outcome, it is a far cry from a full recovery.  The

Professionals did their job and were paid for it on the terms they requested, pursuant to

the limitations of Section 328(a) of the Bankruptcy Code, and are not entitled to receive a

fee enhancement.

Assuming *arguendo* that Section 330 applies to the retention applications, the Court

would still deny the enhancement.  As stated above, Section 330 requires the Court to

consider (1) the time spent on such services; (2) the rates charged for such services; (3)

whether the services were necessary to the administration of, or beneficial at the time at

which the service was rendered toward the completion of, a case under this title; (4)

whether the services were performed within a reasonable amount of time commensurate

with the complexity, importance, and nature of the problem, issue, or task addressed; (5)

with respect to a professional person, whether the person is board certified or otherwise

has demonstrated skill and experience in the bankruptcy field; and (6) whether the

compensation is reasonable based on the customary compensation charged by

comparably skilled practitioners in cases other than cases under this title.  Applying the

factors in Section 330 to the case at bar: (1) the time spent on such services is what would

be expected for this type of case, including the auction and sale process; (2) the rates charged for such services were as expected for the work performed, as the Professionals charged their full hourly rates; (3) while the services were necessary and performed competently, they were not extraordinary; (4) the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed, taking into account that the Court invited an extended timeframe; (5) the firms demonstrated the skill and experience in the bankruptcy field expected of the rates charged, and did not charge a reduced hourly rate; and (5) the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title, as the Professionals charged their normal fees.  Regarding the risk of non-payment, the Court notes that this risk all but disappeared on January 17, 2014 when Hybrid's right to credit bid was capped under Section 363(k) of the Bankruptcy Code.  Moreover, most of the Professional fees were sitting in a separate escrow account thereby eliminating any risk of non-payment.  The total amount held in escrow prior to the commencement of the auction was $1,750,000, and it was increased to $2,350,000 prior to the global settlement that led to the Term Sheet.  Even had the Court found that the Professionals had borne a risk of non-payment, such risk would justify a fee enhancement only if the Professionals had established that their client, the Committee, would have faced substantial difficulty in securing representation and that the fee enhancement would bring the compensation to the market rate.  *In re Our City Center Assocs.*, 111 B.R. 872, 877 (Bankr. E.D. Cal. 1990) (citing *Hasbrouck v. Texaco, Inc.*, 879 F.2d 632, 636-37 (9th Cir. 1989).  The Professionals did

not argue they met this test.  Several highly respected law firms and financial advisors lobbied to serve the Committee.  Application of the Section 330 factors shows that enhancement of the Committee's fees is not warranted in this case.

The Court is disinclined to award fee enhancements in cases where professionals have been paid handsome market-rate hourly fees and creditors have received less than full recovery.  Some of the attorneys in this case charged and were paid over $1,000 per hour.  When attorneys are paid at that rate, the Court expects that work performed will be exceptional.

Procedurally, the Committee's fee request of $53,533.00 for the time spent preparing for this fee enhancement dispute is also denied.  The Court finds that the fee enhancement arguments were not a service provided for the benefit of the estate and the work was not authorized by the terms of engagement.  The Court also finds that the Committee inappropriately billed $99,966.50 for work related to the liquidating trust, and will deny this fee.  Brown Rudnick was working on matters which belonged to the liquidating trust and outside the role of committee counsel. Finally, the Court will also deny the Professionals' request for substantial contribution compensation, finding that the Committee is statutorily ineligible and also because they missed the September 12, 2014, administrative claim bar date.  The Professionals are statutorily ineligible for a substantial contribution claim because they are not a creditor, indenture trustee, equity security holder or a committee appointed under a section of the Bankruptcy Code other than Section 1102.  11 U.S.C. § 503(b)(3)(D).

## CONCLUSION

For the reasons discussed, the Court will deny the Committee's request for a fee enhancement and substantial contribution compensation.  The Court will also deny the Committee's request for fees for time spent on the fee enhancement and work related to the liquidating trust.  An Order will issue.


Dated:  January 21, 2015

KEVIN GROSS
United States Bankruptcy Judge