IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>FAH LIQUIDATING CORP., et al.[1] (f/k/a FISKER AUTOMOTIVE HOLDINGS, INC.),<br><br>Debtors. | Chapter 11<br><br>Case No. 13-13087 (KG)<br><br>Jointly Administered<br><br>Re: Docket No. 936, 1912, 1977<br>Hearing Date: November 29, 2016 @ 10:00 a.m. (ET) |

**PLAINTIFFS' SUR-REPLY TO DEBTORS' THIRD
OMNIBUS OBJECTION TO CERTAIN PROOFS OF CLAIM
(EQUITY CLAIMS AND RECLASSIFICATION CLAIMS) (SUBSTANTIVE)**

The undersigned, bankruptcy counsel for the plaintiffs (the "Plaintiffs") in (i) *Atlas Capital Management, LP v. Henrik Fisker, et al.* Case No. 13-cv-02100-SLR (the "Atlas Action"), (ii) *CK Investments, LLC, et al. v. Henrik Fisker, et al.*, Case No. 14-cv-00118-SLR (the "CK Action"), and (iii) *PEAK6 Opportunities Fund L.L.C., et al. v. Henrik Fisker, et al.*, Case No. 14-cv-00119-SLR (the "PEAK6 Action," and together with the Atlas Action and the CK Action, the "Securities Actions"), each pending in the United States District Court for the District of Delaware (the "District Court"), hereby submits this further response (the "Sur-Reply") to the Reply of Liquidating Trustee (I) In Response to Plaintiffs' Response to *Debtors' Third Omnibus Objection to Certain Proofs of Claim (Equity Claims and Reclassification Claims) (Substantive)* and (II) In Further Support of the Debtors' Third and the Liquidating Trustee's Fifth Omnibus Objections With Respect to the Direct Purchaser Proofs of Claim and Membership Unit Purchaser Proofs of Claim Filed by the Securities Plaintiffs [D.I. 1977] (the "Reply") and states the following:

---

[1] The Debtors are FAH Liquidating Corp. (f/k/a Fisker Automotive Holdings, Inc.) and FA Liquidating Corp. (f/k/a Fisker Automotive, Inc.).

## LIQUIDATING TRUSTEE'S ADDITIONAL BACKGROUND

1.     In the Reply, the Liquidating Trustee notes that on April 26, 2011, prior to the Petition Date, Fisker and Advanced Equities, Inc. ("AEI"), a placement agent, executed a Placement Agent Agreement (the "Placement Agreement"), pursuant to which Fisker apparently engaged AEI to assist in raising equity capital through a private placement of Fisker's Series C-1 Preferred Stock (the "Series C-1 Shares"). The Placement Agreement was not an exhibit to the Third Omnibus Objection nor was it provided to the Plaintiffs prior to the filing of the Reply. In fact, the Placement Agreement was never even referenced in the Third Omnibus Objection.

2.     Under the Placement Agreement, Fisker agreed to pay AEI, among other compensation, a warrant to purchase a number of Series C-1 Shares (the "Warrant"). Placement Agreement § 2. Section 2 of the Placement Agreement gave AEI the right to transfer the Warrant to other broker-dealers it engaged as sub-agents (collectively, the "Sub-Agents," and each a "Sub-Agent").

3.     In or around April 2011, AEI designated Middlebury Securities LLC (together with Middlebury Group LLC, "Middlebury"), another broker-dealer, as its Sub-Agent, in accordance with Section 2 of the Placement Agreement. The Liquidating Trustee maintains, in conclusory fashion, that Middlebury became a party to the Placement Agreement upon its designation as Sub-Agent under the Placement Agreement.

4.     The Sub-Placement Agreement[2] (which the Liquidating Trustee did not attach to or discuss in the Reply) apparently memorializes the relationship between AEI as agent and Middlebury as Sub-Agent. No Debtor is party to the Sub-Placement Agreement.

5.     On May 3, 2011 and May 6, 2011, through certain Assignment and Assumption of Warrants agreements by and between AEI and the Middlebury Securities LLC (the "Assignments"), AEI transferred the Warrant to Middlebury Securities LLC as its designated Sub-Agent. On May 11, 2011, Fisker and Middlebury executed that certain Amended and Restated Series C-1 Preferred Stock Purchase Warrant (as subsequently amended, the "Stock

---

[2] A copy of the Sub-Placement Agreement is attached hereto as **Exhibit A**.

Purchase Warrant").[3] The Assignments are identified and referenced throughout the Stock Purchase Warrant.

6. The Stock Purchase Warrant is the only document identifying both a Debtor and Middlebury as parties.

## SUMMARY OF LIQUIDATING TRUSTEE'S ARGUMENT

7. The Liquidating Trustee argues that the Membership Unit Purchaser Proofs of Claim are subject to mandatory subordination under section 510(b) because, according to the Liquidating Trustee, (i) the Membership Units are securities of the Debtors; or (ii) the Membership Units were issued by Middlebury as an affiliate of the Debtors.

8. As support for its argument that the Membership Units are securities of the Debtors, the Liquidating Trustee argues that the Plaintiffs fully appreciate that the Membership Units are securities of the Debtors because the Consolidated Amended Complaint in the Atlas Action [Case No. 13-2100-SLR, Docket No. 145] (the "Atlas Complaint") describes the Membership Units as "Fisker Automotive Securities," and categorized their claims as being "in connection with purchases of . . . . Fisker Automotive preferred stock through . . . Middlebury." Second, the Liquidating Trustee argues, citing *In re Telegroup, Inc.*, 281 F.3d 133, 138 (3d Cir. 2002), that the Membership Unit Proofs of Claim "arise from" the Membership Unit Purchasers' purchase of securities because there is a "nexus or causal relationship between the claims and the purchase of the securities." The Liquidating Trustee argues that because the Membership Units were based on the value of Fisker's Series C-1 Shares, there is an identity of interest between the Membership Units and other securities issued directly by Fisker sufficient to render each Membership Unit a security of the Debtor, although they are nowhere identified as such and no such "identity of interest" language appears in section 510(b).

9. The Liquidating Trustee also argues that the Membership Units were issued by Middlebury as an "affiliate" of the Debtors under section 101(2)(C) because

---

[3] The Stock Purchase Warrant is attached as Exhibit B to the Liquidating Trustee's Reply.

Middlebury is somehow a "person substantially all of whose property is operated under an operating agreement with the Debtors." According to the Liquidating Trustee, Middlebury became a party to the Placement Agreement between Fisker and AEI when AEI designated Middlebury as its sub-agent under the Placement Agreement. The Liquidating Trustee argues that, like the operating agreement in *In re American Housing Foundation*, the Placement Agreement defines the business and purposes of Middlebury—to raise capital for Fisker. 785 F.3d 143 (5th Cir. 2015), *as revised* (June 8, 2015). The Liquidating Trustee asserts the Placement Agreement is "plainly a contract between Fisker and Middlebury," which under *SemCrude*, provides an independent and sufficient basis for finding that Middlebury is an affiliate of Fisker. The Liquidating Trustee also asserts that a close relationship between Fisker and Middlebury is evident given that Middlebury functions as an intermediary between Fisker and the Membership Unit Purchasers. Finally, the Liquidating Trustee claims that substantially all of Middlebury's property—the Membership Units—were operated under an operating agreement with the Debtor because the Membership Units were based exclusively on Middlebury's purchase of Series C-1 Shares.

10. The Liquidating Trustee attempts to distinguish *WaMu* and *SemCrude*—both cases in which Courts in this District held there was no affiliate relationship and no operating agreement—by arguing that the agreements at issue in those cases were between two non-debtors, and that the value of the securities at issue in those cases had no rational nexus to the value of the debtor. Instead, ignoring prior decisions of Courts in this District, the Liquidating Trustee compares the Membership Unit Purchaser Claims to the claim that was subordinated in *In re Tristar Esperanza Properties, LLC*, 782 F.3d 492, 495 (9th Cir. 2015). In *Tristar*, the Ninth Circuit found that a claimants' state court judgment against the debtor (an LLC) based on the debtor's failure to repurchase her membership interest in the LLC was a claim "for damages arising from the purchase or sale" of securities of the debtor, and thus subordinated the claim, notwithstanding the finding that on the petition date, the claimant was a creditor, and not an equity holder. *Id.* (internal quotations omitted).

## RESPONSE

### I. The Membership Unit Purchaser Proofs Of Claim Are Not Subject To Subordination Under Section 510(b) Of The Bankruptcy Code.

11.     The Membership Unit Purchaser Proofs of Claim are not based upon securities of the Debtors or an affiliate of the Debtors as required for subordination under section 510(b) of the Bankruptcy Code.

#### A. The Membership Unit Purchaser Proofs Of Claim Are Not Subject To Subordination Because The Membership Units Are Not Securities Of The Debtors.

12.     The Liquidating Trustee places great significance on several excerpts from the complaint in the Atlas action that it contends illustrate that the Plaintiffs "fully appreciate that the Membership Units are indeed Fisker securities." The Plaintiffs do not dispute that Middlebury's assets were primarily Fisker preferred stock. But the Plaintiffs who purchased Membership Units did not purchase Fisker preferred stock. They purchased Membership Units in the Middlebury SPVs – which are securities issued by Middlebury.

13.     Plaintiffs also do not dispute that in the Atlas Action complaint, "Fisker Automotive Securities" was used as the defined term for "membership units based exclusively on Fisker Automotive Securities," *see* Atlas Compl. ¶ 1, or that the first claim for relief provides that "Fisker Automotive is the issuer of the Fisker Automotive Securities the Fisker Automotive Plaintiffs purchased, and from which the Fisker Automotive Securities the Middlebury Plaintiffs purchased are derived." *See* Atlas. Compl. ¶ 128.

14.     The Liquidating Trustee's desperate attempt to claim that the usage of certain terms in the Atlas Complaint in the context of violations of the federal securities laws somehow constitutes an admission by the Plaintiffs that the securities are "of the debtor" for purposes of section 510(b) is baffling. First, the Liquidating Trustee did not raise these arguments in the Omnibus Objection. Second, the use of terms and other colloquial descriptions by the Plaintiffs in the Securities Actions complaints in the District Court in connection with

violations of the federal securities laws are immaterial to the issue currently before this Court which is: whether, as a matter of law, the Membership Units are securities of the Debtors for the specific purposes of section 510(b). Indeed, in *SemCrude,* Judge Shannon rejected the debtors' argument that the lead plaintiff's use of the word "affiliate" in its proofs of claim and the securities litigation complaint had any bearing on the court's determination of whether an entity is an affiliate for purposes of section 510(b). *See SemCrude,* 436 B.R. 317, 321 (Bankr. D. Del. 2010) "(a party may use a word in one context without necessarily intending its precise legal meaning in another context. [An entity] may indeed be an "affiliate" as the term is used in common speech, or for purposes of state corporate law, and yet not be an affiliate for purposes of section 510(b)").

15. Bankruptcy Courts in the Third Circuit recognize the principle that "judicial admissions are restricted in scope to matters of fact .... A legal conclusion—e.g., that a party was negligent or caused an injury—does not qualify [as] a judicial admission." *In re SemCrude, L.P.*, 436 B.R. 317, 322 (Bankr. D. Del. 2010). There is also support in this Circuit for the proposition that admissions made in separate proceedings are non-binding and nonconclusive. *Id.* at 321 (rejecting debtors' argument that plaintiffs' use of the word "affiliate" in its securities action claims amounted to an admission of an entity's affiliate status). Whether securities issued by Middlebury are securities of the Debtor for purposes of section 510(b) is a legal issue not subject to a judicial admission. Thus, for the foregoing reasons, the Liquidating Trustee's arguments based on the language utilized in the Atlas Complaint fail.

16. The Liquidating Trustee continues to claim that "it is easy to see why the Membership Units are securities of the debtor," arguing that (a) Membership Unit Purchaser Proofs of Claim are claims for damages; and (b) Membership Unit Purchaser Proofs of Claim "arise from" the Membership Unit Purchasers' purchase of securities, as there is manifestly a nexus or causal relationship between the claims and the purchase of the securities. It seems the Liquidating Trustee is attempting to argue that the presence of the first two elements of subordination under section 510(b)—that is, that the claim is one for damages, and that the claim

arises from the purchase of a security—somehow establishes the third element—that is, that the security is "of a debtor." However, these three elements are entirely independent of each other, such that the presence of one has no effect on the presence of the others. Moreover, the language of section 510(b) is clear and unambiguous and says nothing about a manifest nexus or causal relationship as a basis for subordination.

17. Additionally, the Liquidating Trustee's reliance on *Tristar* is entirely misplaced, as the *sole* issue in that case was whether the claim was "for damages arising from the purchase or sale" of the security at issue. In fact, there was no issue in *Tristar* as to whether the security at issue was "of the debtor or of an affiliate of the debtor. The Ninth Circuit's opinion specifically indicates that the parties stipulated that the LLC membership interest was a security of the debtor. *Tristar*, 782 F.3d at 495 ("The parties agree that [the claimant's] membership interest in Tristar is a 'security of the debtor.'"). In contrast, here, while the Membership Unit Purchaser Proofs of Claim arise from their purchase of the Membership Units, the Membership Units are not "securities of the debtor or of an affiliate of the debtor" for purposes of section 510(b). Further, the discussion in *Tristar* regarding the subordination of a former equity holder's claim regardless of her status as a creditor is inapplicable because the Membership Unit Purchasers are not, and were never, holders of the Debtors' securities. Thus, *Tristar* has no application to the issues before the Court.

18. The Liquidating Trustee finally asserts that the Membership Units are securities of the Debtors because there is a complete identity of economic interest between the Membership Units and other securities issued directly by Fisker. The Liquidating Trustee, however, does not provide any legal citation for the proposition that this identity of economic interest renders a security to be "of a debtor." Moreover, and again, 510(b) says what it says and is not subject to the strained interpretation the Liquidating Trustee now advances to avoid the consequences of the Debtors' engineered sale of its stock to AEI rather than to the Plaintiffs' directly. The Debtors clearly did not want the Plaintiffs to hold Fisker preferred stock – among other things Membership Unit holders had no voting rights in connection with Fisker

Automotive's affairs and were not subject to the minimum investment amounts required for purchases of Fisker preferred stock. The Debtors must live with the consequences of their decision to participate in this corporate shell game.

19. The Liquidating Trustee simply fails to set forth any legal authority or competent evidence to support subordination of these claims under section 510(b) of the Bankruptcy Code as claims in connection with the purchase of securities of the Debtor. In fact, the Debtors concede that the Membership Unit Purchasers are not holders of securities of Fisker as contemplated by section 510(b) of the Bankruptcy Code. *See* Omnibus Objection, ¶ 12 ("[T]he applicable putative creditors are asserting claims on account of equity interests held in various entities that in turn hold interests in FAH Liquidating Corp.—as opposed to actual ownership of interests in FAH Liquidating Corp. itself.").

20. Thus, for the reasons more fully set forth in the Plaintiffs' Response to the Omnibus Objection, the securities held by the Membership Unit Purchasers do not appear in the Debtors' capital structure and do not constitute interests in the Debtors. *See In re Lehman Bros. Holdings Inc.*, 513 B.R. 624, 631 (Bankr. S.D.N.Y. 2014). Thus, as illustrated by the courts' rulings in *Lehman Brothers* and *Washington Mutual*, and the Debtors' admissions in their Omnibus Objection, the Membership Units are not securities of the Debtors. Therefore, the Membership Unit Purchaser Proofs of Claim are not subject to subordination under section 510(b) as claims in connection with the purchase or sale of securities of the Debtors.

B. **The Membership Unit Purchaser Proofs Of Claim Are Not Subject To Subordination Because The Membership Units Are Not Securities Of An Affiliate Of The Debtors**

21. The Membership Units are not securities of an affiliate of the Debtors because they are securities of a non-Debtor which does not fall within the Bankruptcy Code's definition of the term "affiliate." *See* 11 U.S.C. § 101(2).

22. The Liquidating Trustee claims that the Membership Units were issued by Middlebury, arguing that it is an affiliate of the Debtors pursuant to section 101(2)(C) because it

is a "person substantially all of whose property is operated under an operating agreement with the Debtors." The Liquidating Trustee strains credulity by insisting that Middlebury became a party to the Placement Agreement between the Debtor and AEI when AEI designated Middlebury as its sub-agent under the Placement Agreement. Leaving aside whether the Placement Agreement is an operating agreement (which it is not as set forth below), the Liquidating Trustee argues that, like the operating agreement in *American Housing*, the Placement Agreement defines the business and purposes of Middlebury—to raise capital for Fisker. It asserts the Placement Agreement is "plainly a contract between Fisker and Middlebury," which under *SemCrude*, provides an independent and sufficient basis for finding that Middlebury is an affiliate of Fisker. The Liquidating Trustee also asserts that a close relationship between Fisker and Middlebury is evident given that Middlebury functions as an intermediary between Fisker and the Membership Unit Purchasers. Finally, the Liquidating Trustee incorrectly argues that substantially all of Middlebury's property—the Membership Units—were operated under an operating agreement with Fisker because the Membership Units were based exclusively on <u>Middlebury's purchase</u> of Series C-1 Shares.

    i.    <u>American Housing Foundation</u>

23. *In re American Housing Foundation*, 785 F.3d 143 (5th Cir. 2015), *as revised* (June 8, 2015), the debtor was a nonprofit low-income housing developer. The debtor created single purpose limited partnerships (LPs) to fund its developments. Interests in the LPs were sold to investors and guaranteed by the debtor. The debtor or its wholly-owned subsidiaries served as the general partners of the LPs and the private investors would serve as limited partners. The chapter 11 trustee brought an adversary proceeding to subordinate a breach of guaranty claim held by an investor (Templeton) who had invested in five (5) different LPs. The Fifth Circuit held that the LPs were affiliates of the debtor under section 101(2)(C) of the Bankruptcy Code.

24. In reaching this decision, the *American Housing* Court first noted that the definition of "affiliate" in section 101(2)(C) is susceptible to two interpretations, as it is unclear

whether the "by a debtor" phrase is meant to modify the word "operated" or the phrase "operating agreement." Under the first construction, an affiliate relationship exists where the debtor exercises legitimate control over such entity, while under the latter construction, the operating agreement itself must be "by a debtor"—implying that the debtor must be a party to that agreement. *In re Am. Hous. Found.*, 785 F.3d 143, 156 (5th Cir. 2015).

25. The Fifth Circuit concluded that (i) the LPs were affiliates under the first construction because the debtor—as either general partner of the LPs or the direct parent company of the general partner of the LPs—had legitimate control of the entities and whatever revenue or income came to those entities; and further, that (ii) the LPs were also affiliates under the second construction because (a) the debtor was party to LP agreements with two (2) of the LPs; and (b) even with respect to the three (3) LPs for which the debtor's wholly owned subsidiaries (and not the debtor itself) were party to LP agreements, it was undisputed that the debtor had complete control over the LPs. To support the finding that the LP agreements with the debtor's subsidiaries were agreements "by the debtor," the court noted: (i) the debtor exerted full control over the LPs in general; (ii) the debtor exerted total control over all aspects of the Templeton deals/investments; (iii) the intermediary (subsidiary) did not affect the debtor's control; (iv) the control was formalized by the partnership agreements; (v) the control was established by the formalized relationship between the LPs and their general partner. *Id.* at 156-57.

26. However, what the Liquidating Trustee fails to advise the Court is that **even the *American Housing* court specifically pointed out that its conclusion "is in tension with decisions reached by several bankruptcy courts," and more specifically, directly conflicts with two recent decisions from the Delaware Bankruptcy Courts: *Washington Mutual* and *SemCrude*.** *Id.* 157; *see, e.g. In re Wash. Mut., Inc.*, 462 B.R. at 146 (holding that "because the agreement in question is between two non-debtors, it cannot provide a basis for subordination under section 101(2)(C)," and rejecting the argument that "mere 'control' of an entity is sufficient to ignore its legal separateness"); *In re SemCrude, L.P.*, 436 B.R. 317, 321

(Bankr. D. Del. 2010) ("[E]ven if the Debtors could show that the partnership agreement is a lease or operating agreement, the agreement is between two non-debtors."); *In re Sporting Club at Ill. Ctr.*, 132 B.R. 792, 797 (Bankr. N.D. Ga.1991) (determining that entity was not an affiliate of debtor for purposes of venue statute where the debtors were not "parties to any lease or operating agreement"); *In re Maruki USA Co.*, 97 B.R. 166, 169 (Bankr. S.D.N.Y. 1988) (rejecting, for purposes of venue, argument that entity was affiliate of debtor where debtor owned 100% of stock of entity's general partner).

27. Thus, the *American Housing* decision is not binding on this Court. Further, as the *American Housing* court pointed out itself, Third Circuit courts strictly interpret the construction of the term "affiliate," typically requiring that the debtor actually be party to the operating agreement in order for an affiliate relationship to exist. Here, the Placement Agreement—which the Liquidating Trustee argues renders Middlebury an affiliate of the Debtors—is a contract between only the Debtors and AEI. Further, the Sub-Placement Agreement is between only AEI and Middlebury. Plaintiffs have uncovered no Third Circuit decision finding the existence of an "operating agreement" under section 101(2)(C) where the parties to the agreement were both non-debtors.

28. Even if the Placement Agreement *were* between a Debtor and Middlebury (which it is not), it is *not* an operating agreement. The Placement Agreement in this case provides the Debtor with significantly less control than the LP agreements discussed in *American Housing*. Thus, even if the Court decided to apply the Fifth Circuit precedent (which, respectfully, it should not), the Placement Agreement is insufficient to establish an affiliate relationship between Middlebury and the Debtors because it is not an operating agreement. While the Liquidating Trustee would have the Court believe that under the *American Housing* decision, an operating agreement is established where it simply "define[s] the business and purposes" of the debtor, this was only one of the many factors considered by the *American Housing* court. As set forth in paragraph 23 above, where the debtor was not a party to the agreement, the court was only able to find sufficient control as a result of an extensive record of

formalized written agreements and witness testimony that undisputedly established full control over the non-debtor's operations in general, the non-debtor's specific dealings with the claimant, and the non-debtor's revenue or income stream. *Id.* at 156.

29.  In comparison, the Placement Agreement here (to which Middlebury is not party) does not give the Debtors full control over AEI's revenue (or any control over Middlebury's revenue), and rather, provides that AEI is entitled to an 8% commission of the gross proceeds invested and a warrant to purchase a number of Series C-1 Shares issued by the Debtors. Moreover, section 9 of the Placement Agreement, which provides that AEI "will perform its services hereunder as an independent contractor," clearly illustrates that the relationship created by the Placement Agreement is more akin to a relationship between an individual and a service provider. Further, the Sub-Placement Agreement, to which Middlebury is actually party (which curiously, is not discussed by the Liquidating Trustee or attached to the Reply) adds an intervening layer between the Debtors and Middlebury. Indeed, section 7 of the Sub-Placement Agreement gives AEI full authority and control over AEI's conduct in connection with the offering. Sub-Placement Agreement § 7 ("Placement Agent shall have full authority to take such action as it may deem necessary with respect to all matters pertaining to the Offering or arising thereunder."). Additionally, the Sub-Placement Agreement provides that as compensation for its services, Middlebury is entitled to compensation from the Debtor in the amount of 50% of the purchase price of the securities placed by Middlebury. Sub-Placement Agreement § 3. This income stream from this contractual right to compensation is unquestionably an asset of Middlebury, over which, the Debtor can exercise no control. Thus, the extent of the control exerted by the Debtor in this case is at best, attenuated, and certainly not the complete and undisputed control exerted by the *American Housing* debtor over the LPs and their assets. Accordingly, the Placement Agreement with AEI (to which Middlebury is not a signatory or party) does not confer upon the Debtor sufficient control of Middlebury's assets and operations to render it an operating agreement, and therefore, no affiliate relationship is present.

30.     Finally, while the *American Housing* court maintains that its decision affirming the judgment subordinating Templeton's claim was made solely on the basis of section 510(b), it is worth noting that the primary theory underlying the trustee's objection to Templeton's Claim was that Templeton's investments were abusive tax shelters and that Templeton "knew or should have known that the investment[s] [were] purely for illegitimate and improper tax purposes." *In re Am. Hous. Found.,* 785 F.3d 143, 153 (5th Cir. 2015) ("Even assuming *arguendo* the truth of this premise, we need not decide whether [Templeton's alleged] misconduct warrants subordination under the Bankruptcy Code. Rather, as discussed below, we affirm the judgment subordinating Templeton's Claim solely on the basis of Section 510(b), which is narrowly focused on the nature of the claims and transactions at issue.").

ii.     <u>SemCrude</u>

31.     In *In re SemCrude, L.P.,* 436 B.R. 317, 320 (Bankr. D. Del. 2010), the Bankruptcy Court for the District of Delaware addressed precisely the same issue as that in *American Housing:* whether an entity was an "affiliate" of the debtor where the debtor was the direct parent of the entity's general partner. The court, however, reached the opposite conclusion, holding that a non-debtor limited partnership did not qualify as an "affiliate" of the debtor where its non-debtor general partner and two percent owner was wholly owned by a debtor, noting "[w]hether an entity is an 'affiliate,' depends, of course, upon the structure of the relevant entity's corporate family."

32.     The Liquidating Trustee attempts to distinguish *SemCrude* by pointing out that the basis for the court's determination that the non-debtor entity was not an affiliate of the debtor was that the debtors failed to introduce a lease or operating agreement into evidence in connection with the debtors' objection. *SemCrude,* 436 B.R. at 321. The Liquidating Trustee, however, neglects to point out that the Court took the analysis one step further, explaining that while the debtor had only obliquely mentioned the existence of a partnership agreement between the non-debtor limited partner and its general partner, the partnership agreement—even if introduced into evidence, would likely not satisfy section 101(2)(C)'s definition of "affiliate."

The court explained that even if the Debtors could show that the partnership agreement was a lease or operating agreement, the agreement was between two non-debtors. *In re SemCrude, L.P.*, 436 B.R. 317, 321 (Bankr. D. Del. 2010).

33. This set of facts—under which there is an intervening non-debtor general partner between the debtor and the alleged affiliate entity—is insufficient, according to Third Circuit law, to create an affiliate relationship between the debtor and the alleged affiliate entity. *See In re SemCrude, L.P.*, 436 B.R. 317, 321-22 (Bankr. D. Del. 2010). Non-binding authority of questionable applicability on its face and which directly contradicts authority from within the Third Circuit should not serve as the basis for 510(b) subordination.

34. Thus, the Debtors provide no binding legal authority or factual basis to support a finding that the Membership Units are securities of an affiliate of the Debtors. Therefore, because the Membership Units are not securities of the Debtor or an affiliate of the Debtor as defined under section 101(2) of the Bankruptcy Code, the Membership Unit Purchaser Proofs of Claim should not and cannot be subordinated under section 510(b) of the Bankruptcy Code.

    **C.    The Plain Meaning Of Section 510(b) Controls**

35. The Liquidating Trustee argues that its position is also supported by the policy underlying section 510, which is to ensure that a debtor's creditors are repaid before its equity holders. (Reply at ¶ 49). The Third Circuit confirms that "Section 510(b) thus represents a Congressional judgment that, as between shareholders and general unsecured creditors, it is shareholders who should bear the risk of illegality in the issuance of stock <u>in the event the issuer enters bankruptcy</u>." *In re Telegroup, Inc.*, 281 F.3d 133, 141 (3d Cir.2002). *See also In re VF Brands, Inc.*, 275 B.R. 725, 728 (Bankr. D. Del. 2002) (emphasis provided) (explaining that Congress intended section 510 to prevent equity holders from getting "the best of both worlds"—equity's upside potential and creditors' downside protection).

36. First, there is no evidence, and in fact it is undisputed, that the Debtor is not the "issuer" of the Membership Units. Second, concluding that section 510(b) is inapplicable here does not run afoul of Congressional intent. Moreover, courts are constrained by the plain meaning of the statute where that meaning is unambiguous. *In re SemCrude, L.P.*, 436 B.R. 317, 322 (Bankr. D. Del. 2010) ("The first step in interpreting a statute is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case. When the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms.") (internal citations and quotations omitted).

37. Here, the Liquidating Trustee has not identified any relevant ambiguity in the text of sections 510(b) which would allow the Court to look beyond the terms of the relevant statute. *See id.*

## CONCLUSION

38. For all the foregoing reasons, Plaintiffs respectfully request that the Court enter an Order (i) overruling the Omnibus Objection to the extent it seeks to subordinate and/or disallow and expunge the Membership Unit Purchaser Proofs of Claim; (ii) denying the separate classification of the Direct Purchaser Proofs of Claims; and (iii) granting such other and further relief as the Court deems just and proper.

Dated: November 21, 2016

By: */s/ Norman M. Monhait*
Norman M. Monhait [DE 1040]
**ROSENTHAL, MONHAIT & GODDESS, P.A.**
919 N. Market Street, Suite 1401
P.O. Box 1070
Wilmington, Delaware 19899
302.656.4433 (Telephone)
302.658.7567 (Facsimile)

- and -

Michael S. Etkin, Esq.
Nicole M. Brown, Esq.
**LOWENSTEIN SANDLER LLP**
65 Livingston Avenue
Roseland, New Jersey 07068
973.597.2500 (Telephone)
973.597.2400 (Facsimile)

*Bankruptcy Counsel to Plaintiffs*

**KLAFTER OLSEN & LESSER LLP**
Kurt B. Olsen, Esq.
1250 Connecticut Ave., N.W.
Suite 200
Washington, DC 20036
202.261.3553 (Telephone)
202.261.3533 (Facsimile)

**BERGER & MONTAGUE, P.C.**
Todd S. Collins, Esq.
1622 Locust Street
Philadelphia, PA 19103
215.875.3000 (Telephone)
215.875.4604 (Facsimile)

*Counsel to Plaintiffs*