## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| FAH LIQUIDATING CORP., *et al.*, | ) | |
| (f/k/a FISKER AUTOMOTIVE HOLDINGS, INC.), | ) | Case No. 13-13087(KG) |
| | ) | |
| Debtors. | ) | **Re: D.I. 936, 1249** |
| _____ | ) | |

## <u>OPINION</u>

## INTRODUCTION

The issue at hand is this: are claims of Membership Unit Purchasers to be subordinated pursuant to section 510(b) of the Bankruptcy Code because they are or are not securities of the Debtors or an affiliate of the Debtors? The Court will deny subordination and therefore overrule certain of the claims objections under the circumstances presented. Before the Court are the Debtors' Third Omnibus Objection to Certain Proofs of Claim (Equity Claims and Reclassification Claims) (Substantive) (the "Debtors' Objection") (D.I. 936) and the Fifth Omnibus Objection to Certain Proofs of Claim (Amended and Superseded Claims, Wrong Debtor Claims, Duplicate Claims, Late Filed Claims, and Equity Claims) (Non-Substantive) (the "Trustee's Objection")[1] (D.I. 1249). In the Debtors' Objection and the Trustee's Objection, the Trustee seeks, among

---

[1] In its objection, the Trustee adopts the Debtors' Objection as successor-in-interest to the Debtors.

other things, to subordinate certain Direct Purchaser Claims[2] and Membership Unit Purchaser Claims[3] and to disallow and expunge the Membership Unit Purchaser Claims and Direct Purchaser Claims.

As a result of the Court's Order Confirming Debtors' Second Amended Joint Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code (the "Plan") (D.I. 1137), the Court approved the Plan and the FAH Liquidating Trust came into existence as the successor-in-interest to the Debtors. The parties agree that the Direct Purchaser Claims are subject to subordination. They do not agree, however, on the treatment of the Membership Unit Purchaser Claims.

## JURISDICTION

The Court has subject matter jurisdiction over this controversy under 28 U.S.C. §§ 1334 and 157(a). This is a core proceeding under 28 U.S.C. § 157(b)(2)(B).

## FACTS

Over three years ago, on November 22, 2013, the Debtors[4] filed for protection under Chapter 11 of the Bankruptcy Code (the "Petition Date"). The Debtors were founded in 2007 to design, assemble, and manufacture premium plug-in hybrid electric vehicles in the United States. The Debtors faced many difficulties that prevented them from operating as planned. The challenges included safety recalls related to battery packs

---

[2] Proofs of Claim Nos. 233, 281, 366, 387, and 465.
[3] Proofs of Claim Nos. 211, 215, 218, 224, 250, 300, 498 and 569.
[4] The Debtors are Fisker Automotive Holdings, Inc. and Fisker Automotive, Inc.

supplied by a third party vendor, the loss of a material portion of their existing unsold vehicle inventory in the United States during Hurricane Sandy in 2012, and the loss of their lending facility provided through the United States Department of Energy.

In the months following the Petition Date, three groups of plaintiffs (the "Plaintiffs") filed separate district court actions against current or former officers and directors of FAH Liquidating Corp. (*f/k/a* Fisker Automotive Holdings, Inc.) ("Fisker") and certain of Fisker's controlling shareholders for violations of the Securities Act of 1933 and the Securities Exchange Act of 1934 (the "Securities Actions"). Neither of the Debtors were named in the Securities Actions. The Plaintiffs filed the first of the Securities Actions, *Atlas Capital Management, LP v. Henrik Fisker, et al.*, Case No. 13-cv-02100-SLR (the "Atlas Action"), on December 27, 2013, followed by the second, *CK Investments, LLC, et al. v. Henrik Fisker, et al.*, Case No. 14-cv-00118-SLR (the "CK Action"), and the third, *PEAK6 Opportunities Fund L.L.C., et al. v. Henrik Fisker, et al.*, Case No. 14-cv-00119-SLR (the "PEAK6 Action"), on January 31, 2014.

It is helpful to separate the Plaintiffs in the Securities Actions and their claims into two categories: those who directly purchased Fisker's preferred stock (the "Direct Purchasers") and those who purchased membership units ("Membership Units") in entities ("Special Purpose Vehicle[s]")[5] that independently purchased or held preferred

---

[5] The Plaintiffs do not specify the entities that comprise the Special Purpose Vehicles. Additionally, as discussed in more detail below, the parties refer to the entities in which the

stock issued by Fisker (the "Membership Unit Purchasers"). The PEAK6 Plaintiffs fall

into the first category, Direct Purchasers. Each of the Direct Purchasers filed individual

proofs of claim ("Direct Purchaser Claims")[6] against Fisker for damages arising from the

allegations in the PEAK6 Action. As previously stated, the Direct Purchasers do not object

to subordination of their claims and the Court will permit their claims to be subordinated

upon the filing of an appropriate motion.[7] The Plaintiffs in the Atlas Action and the CK

Action fall into the second category, Membership Unit Purchasers. Almost all of the

Membership Unit Purchasers filed individual proofs of claim ("Membership Unit

Purchaser Claims") against Fisker for damages arising from the allegations in the Atlas

Action and the CK Action.

A few years before the Petition Date, on April 26, 2011, Fisker and Advanced

Equities, Inc. ("AEI"), a placement agent, executed the Placement Agreement, dated April

26, 2011 (the "Placement Agreement"). Under the Placement Agreement, Fisker engaged

AEI to assist in raising equity capital through a private placement of Fisker's Series C-1

Preferred Stock (the "Series C-1 Shares"). The Placement Agreement (D.I. 1977, Ex. A)

---

Membership Unit Purchasers invested by different names (i.e., "Special Purpose Vehicles" and "Middlebury").

[6] The Direct Purchaser Proofs of Claim are claim numbers 233, 281, 366, 387, and 465.

[7] The Court notes the Plaintiffs' objection to the Debtors' request via footnote on p. 4 n.4 of the Objection to classify the Direct Purchaser Proofs of Claim as a separate class of creditors in the *Debtor's Second Amended Joint Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code* [D.I. 985]. As mandated by Bankruptcy Rule 3013, the Trustee must bring a separate motion, on notice, to classify the Direct Purchaser Proofs of Claim separately.

contemplated that AEI might organize limited liability companies to encourage

investment participation by qualified investors. D.I. 1977, Ex. A ¶ 1(d). As compensation

for AEI's services under the Placement Agreement, Fisker agreed to pay AEI, among

other compensation, a warrant to purchase a number of Series C-1 Shares (the

"Warrant"). The compensation section also provided AEI the right to transfer the

Warrant to other broker-dealers it engaged as sub-agents ("Sub-Agents" or "Sub-

Agent"). The relevant section of the compensation section states:

> [Fisker] shall pay [AEI] . . . a warrant, exercisable for seven years without
> restriction, to purchase a number of shares of the [Fisker's] Series C-1
> Preferred Stock equal to 8.0% of the number of shares of Series C-1
> Preferred Stock issued by [Fisker] to [AEI] and its affiliates and/or any
> Qualified Investors in the Financing (including AEI Investment LLCs),
> issuable promptly following the final closing (the "Warrant"). . . . [AEI]
> shall have the right to share Fees with and transfer Warrants to its Sub-
> Agents, the amount of which shall be [AEI's] sole responsibility.

D.I. 1977, Ex. A ¶ 2. AEI also agreed that in connection with the performance of its duties

under the Placement Agreement, it would ensure the compliance of, among others, its

own Sub-Agents. D.I. 1977, Ex. A ¶ 4(i). Likewise, Fisker agreed that it would not

"communicate directly with any of [AEI's] . . . Sub-Agents . . . without the prior consent

of [AEI]." D.I. 1977, Ex. A ¶ 5(d). Lastly, the Placement Agreement specifies that AEI

would fulfill its duties under the agreement as an independent contractor. D.I. 1977, Ex.

A ¶ 9.

It is important here to note a discrepancy between the terms used by the parties to

describe the entities in which the Membership Unit Purchasers invested. In the Debtors'

Objection, the Debtors refer to "entities that . . . hold interests in FAH Liquidating Corp.—as opposed to actual ownership of interests in FAH Liquidating Corp. itself." Debtors' Objection, ¶ 12. In the Plaintiffs' response, they describe the entities as Special Purpose Vehicles, but do not specify the names of those entities nor mention any entity named Middlebury. *See* D.I. 1912.

The Trustee's reply is the first time any entity named Middlebury is mentioned. There, the Trustee explains that around the same time that Fisker and AEI executed the Placement Agreement, in April 2011, AEI designated Middlebury Securities LLC ("Middlebury Securities"), another broker-dealer, as its Sub-Agent, in accordance with Section 2 of the Placement Agreement. In anticipation of this designation, AEI and Middlebury Securities entered into the Sub-Placement Agent Agreement dated March 17, 2011 (the "Sub-Placement Agreement"). D.I. 2040, Ex. A. Thereafter, the Trustee refers to Middlebury Securities and another entity named Middlebury Group LLC together as "Middlebury." *See* D.I. 1977, ¶ 12, *et seq*. The Trustee also asserts that "Middlebury" became a party to the Placement Agreement as a result of being designated Sub-Agent.

After "Middlebury" was designated Sub-Agent and executed the Sub-Placement Agreement, it began soliciting qualified investors to purchase Membership Units in at least one Special Purpose Vehicle. Indeed, "Middlebury" circulated a Confidential Private Placement Memorandum (the "April 2011 CPPM") to the Membership Unit

Purchasers soliciting qualified investors to purchase Membership Units in a Special Purpose Vehicle named Middlebury Ventures II ("MVII").

Also after Middlebury was designated Sub-Agent, the Warrant was transferred. In fact, on May 3, 2011 and May 6, 2011, through certain Assignment and Assumption of Warrant agreements by and between AEI and Middlebury Securities, AEI transferred the Warrant to Middlebury Securities LLC as its designated Sub-Agent. As part of this transfer, on May 11, 2011, Fisker and Middlebury Securities executed the Amended and Restated Series CC-1 Preferred Stock Purchase Warrant (the "Stock Purchase Warrant"). The Stock Purchase Warrant is the only document identifying both Debtors and Middlebury as parties.

During oral argument on these claims objections, Plaintiffs clarified that Middlebury Securities is the party to the Sub-Placement Agreement with AEI. *See* D.I. 2040, Ex. A. The Plaintiffs also stated that MVII is the issuer of the Membership Units. Still, it is unclear from the record whether MVII is the only Special Purpose Vehicle that issued the Membership Units. To avoid confusion in the discussion that follows, where the record is unclear as to the exact entity involved the Court will refer to the entities in which the Membership Unit Purchasers invested as "Special Purpose Vehicles."

## DISCUSSION

The Trustee objects to the Membership Unit Purchaser Claims, arguing that they should be subordinated under section 510(b). Under section 502(a) a proof of claim "is

deemed allowed, unless a party in interest . . . objects." 11 U.S.C. § 502(a). Upon objection,

the objector must produce sufficient evidence to overcome the prima facie validity of the

claim for the burden to then shift back to the claimant to prove the validity of the claim

by a preponderance of the evidence. *In re Allegheny Int'l, Inc.*, 954 F.2d 167, 174-75 (3d Cir.

1992).

> Section 510(b) provides in relevant part:
>
> For the purpose of distribution under this title, a claim . . . for damages
> arising from the purchase or sale of [a security of the debtor or of an affiliate
> of the debtor] . . . shall be subordinated to all claims or interests that are
> senior to or equal the claim or interest represented by such security, except
> that if such security is common stock, such claim has the same priority as
> common stock.

11 U.S.C. § 510(b). Congress's purpose in enacting section 510(b) was "to ensure that

shareholders, who have bargained to receive the benefit of the proceeds of a company in

exchange for bearing the corresponding risk of loss, cannot, upon the company's

bankruptcy filing, elevate their claims for illegality in the issuance of the company's stock

to the level of unsecured creditors." *In re Lehman Bros. Holdings Inc.*, 513 B.R. 624, 632

(Bankr. S.D.N.Y. 2014); *see also Baroda Hill Invs., Ltd. v. Telegroup, Inc. (In re Telegroup, Inc.)*,

281 F.3d 133, 141 (3d Cir. 2002) ("Section 510(b) thus represents a Congressional judgment

that, as between shareholders and general unsecured creditors, it is shareholders who

should bear the risk of illegality in the issuance of stock in the event the issuer enters

bankruptcy.").

As such, Membership Unit Purchaser Claims are subject to subordination here if they arise from the purchase or sale of a security of the Debtors or of an affiliate of the Debtors. The parties agree that that the Membership Units are securities for the purposes of the federal securities laws. The parties also agree that the Securities Actions are for damages arising from the purchase or sale of a security. The parties disagree as to whether they are securities of Special Purpose Vehicles—and thus outside the scope of section 510(b)—or whether they are securities of the Debtors or of an affiliate of the Debtors—and thus subject to mandatory subordination under section 510(b).

Whether the Claims Arise from the
Purchase or Sale of a Security of the Debtors

The Court must first determine whether the Membership Unit Purchaser Claims arise from the purchase or sale of a security of the Debtors before determining whether, alternatively, they arise from the purchase or sale of a security of an affiliate of the Debtors. A security of a debtor must be a direct security of a debtor in order to subordinate the securityholder's claim for damages. *See In re Washington Mut., Inc.*, 462 B.R. 137, 146-47 (Bankr. D. Del. 2011); *Lehman Bros.*, 513 B.R. at 631-32. Courts justify subordinating such claims because the securityholder assumed the risk that the debtor-issuer could become insolvent. *In re Washington Mut., Inc.*, 462 B.R. at 146-47.

For example, in *Washington Mutual* (*"WaMu"*), the court addressed the scope of the word "of" in section 510(b)'s phrase "of a security *of* the debtor or of an affiliate of the debtor," and held that it does require that the debtor or affiliate be the issuer of the

securities to subordinate a claim arising from such sale. *WaMu*, 462 B.R. at 146 (emphasis added). *Id.* In *WaMu*, an affiliate of the debtor sold certificates in certain special-purpose trusts to investors, which consisted of pooled residential mortgages including mortgages originated by Washington Mutual Bank as well as those of third parties. *Id.* at 139-40. Pre-petition, the debtor had directly or indirectly owned all of the outstanding capital stock of Washington Mutual Bank and its subsidiaries. *Id.* The *WaMu* court reasoned that where the security was of a third party (the special-purpose trusts) and was merely sold by the debtor or affiliate (a subsidiary of Washington Mutual Bank), the securityholder with a claim for damages arising from the securities transaction with the debtor or affiliate should be treated like any other creditor of the debtor because the securityholder assumed the risk associated with owning the third party's stock, not the debtor's stock. *Id.* at 146-147.

Even when a debtor is considered the issuer under the securities law, a claim arising from the sale of a security may not be considered a security "of" the debtor requiring subordination under section 510(b) where the financial product is unique in nature and separate from the debtor's capital structure. *Lehman Bros.*, 513 B.R. at 632. As in *Wamu*, in *Lehman Bros.* the court addressed whether an investor's claim for damages arising from the sale of certificates in certain trust vehicles owning pooled residential mortgages were securities "of" the debtor. Instead of distinguishing between the debtor as issuer or as seller of the securities, as the court did in *WaMu*, the court in *Lehman* looked

to the plain language of section 510(b) and the nature of the mortgage-backed securities ("MBS") to hold that the MBS "should not be considered a security 'of' the debtor as such phrase is used in section 510(b)." *Lehman Bros.*, 513 B.R. at 632. Although the debtor who served as depositor of the MBS was considered the "issuer" under federal securities laws, the trust vehicles were the actual issuing entities of the MBS. *Id.* at 633 n.26.

Because the debt obligations under the MBS represented claims to the cash flows from pools of mortgage loans, the securityholder's risk turned on borrowers' payment on the loans rather than the debtors' solvency. *Id.* at 631. Indeed, the *Lehman Bros.* court noted that the trusts "serve[d] merely as the conduit vehicles through which to pass payments of third-party mortgagees to the certificateholders." *Id.* "[P]ayment was not owed by and did not come from the business or assets of any of the [d]ebtors." *Id.*

The *Lehman Bros.* court found further support that the securities were separate from the debtors' capital structure in language[8] from a prospectus document associated with the MBS that confirmed the certificates did not represent an interest in the depositor or its affiliates. *Id.* Altogether, the nature of the securities and the relationship between the debtors and certificateholders led the court to conclude that the MBS were not securities "of" the debtor under section 510(b). The *Lehman Bros.* court also emphasized that the purpose of section 510(b) supported the same conclusion because the

---

[8] The statement in the prospectus document specified that the "certificates will represent interests in the issuing entity only and will not represent interests in or obligations of the sponsor, the depositor, or any of their affiliates or any other party." *Lehman Bros.*, 513 B.R. at 630 n.19.

11

certificateholders "received no beneficial interest in the profits of a [d]ebtor which would derive from ownership of the [d]ebtors' equity securities, took no risk arising from purchase of stock of the [d]ebtors, and is not an equityholder." *Id.* at 632 (noting that the certificateholders could not "bootstrap from one position in the [d]ebtors' capital structure to another because [they] hold no position at all within the [d]ebtors' capital structure").

It is clear in the present case that the Special Purpose Vehicles are not debtors and the Membership Units do not constitute securities "of" the Debtors under section 510(b). The facts here are comparable to those in *WaMu* since the Membership Units, like the securities in *WaMu*, are securities of a third party, the Special Purpose Vehicles including MVII as issuer. Moreover, unlike *WaMu*, the securities here were not sold by the Debtors or an affiliate of the Debtors. Instead, Middlebury Securities as Sub-Agent sold the securities, further distancing the Debtors from the securities transaction.

As in *Lehman Bros.*, the Membership Units do not fall within the capital structure of the Debtors. The court there declined to subordinate claims where the debtor was technically the issuer of the securities because of the unique nature of the financial product involved and because the securities were separate from the debtor's capital structure. The *Lehman Bros.* court also acknowledged that the process of securitizing certain assets, including mortgage-backed securities, can result in a jumbled financial product. Here, Fisker entered into the Placement Agreement allowing for a layer of

insulation between itself and potential investors by allowing investors, who became creditors here, to obtain equity interests in Special Purpose Vehicles that in turn held interests in the Debtors, instead of actual ownership interests in the Debtors. *See* Debtor's Objection ¶ 12. As such, the Membership Unit Purchaser Claims arising from the purchase of Membership Units in Special Purpose Vehicles do not arise from the purchase or sale of a security of the Debtors.

Whether the Claims Arise from the Purchase
or Sale of a Security of an Affiliate of the Debtors

The next question is whether, alternatively, the Membership Unit Purchaser Claims arise from the purchase or sale of a security of an affiliate of the Debtors. Section 101(2) provides four definitions for what is an "affiliate." "Affiliate" means:

(A)     entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor, other than an entity that holds such securities—

(i)     in a fiduciary or agency capacity without sole discretionary power to vote such securities; or

(ii)     solely to secure a debt, if such entity has not in fact exercised such power to vote;

(B)     corporation 20 percent or more of whose outstanding voting securities are directly or indirectly owned, controlled, or held with power to vote, by the debtor, or by an entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor, other than an entity that holds such securities—

(i)     in a fiduciary or agency capacity without sole discretionary power to vote such securities; or

  (ii)  solely to secure a debt, if such entity has not in fact exercised such power to vote;

 (C)  person whose business is operated under a lease or operating agreement by a debtor, or person substantially all of whose property is operated under an operating agreement with the debtor; or

 (D)  entity that operates the business or substantially all of the property of the debtor under a lease or operating agreement.

11 U.S.C. § 101(2).

  The Trustee maintains that the Special Purpose Vehicles are affiliates under section 101(2)(C), which defines "affiliate" as a "person whose business is operated under a lease or operating agreement by a debtor, or [a] person substantially all of whose property is operated under an operating agreement with the debtor." 11 U.S.C. § 101(2)(C). The Bankruptcy Code does not define the term "operating agreement," rather caselaw provides a definition. Of particular importance here is caselaw interpreting the phrases "agreement by a debtor" and "agreement with a debtor" in section 101(2)(C).

  The threshold requirement to show that a non-debtor is an affiliate under section 101(2)(C) is that a contract exists between the non-debtor and the debtor. *In re SemCrude, L.P.*, 436 B.R. 317, 320-21 (Bankr. D. Del. 2010). In *SemCrude*, the absence of a contract between the non-debtor limited partnership and the debtor was a gating issue to finding the limited partnership constituted an affiliate under section 101(2)(C). *SemCrude*, 436 B.R. at 320-21. The non-debtor in *SemCrude* was a limited partnership in which the creditor had purchased an equity interest that allegedly resulted in damages forming the basis of

14

the claim that debtors sought to subordinate. The general partner of the limited partnership was a 2% owner of an entity wholly owned by debtors in the Chapter 11 proceedings. The partnership agreement was between a non-debtor in the debtor's corporate family and another non-debtor entity wholly owned by debtors in the Chapter 11 proceedings. *Id.* In its holding, the court emphasized that even if the partnership agreement could qualify as a lease or operating agreement, the fact that the two parties to the agreement were non-debtors eliminated the possibility of satisfying section 101(2)(C)'s definition of "affiliate." *Id.* at 321.

One other point from the *SemCrude* decision of particular relevance here is the court's dismissal of the debtors' argument that the creditors' allegations and admissions in its securities law actions and proofs of claim, purporting to concede the non-debtor limited partnership's status as an affiliate, should be considered conclusive evidence that the limited partnership was an affiliate. *Id.* The court explained that a creditor could use the term "affiliate" in judicial admissions and the proofs of claim without being legally bound to that term in the subordination action and the court acknowledged that "a party may use a word in one context without necessarily intending its precise legal meaning in another context." *Id.* Such judicial admissions are limited to factual matters and are not to be extended to legal conclusions. *Id.* As in *SemCrude,* here the Trustee has referenced portions of the Plaintiffs' complaints in the Securities Actions arguing that the Court

should rely on such statements in this decision. *See* D.I. 1977, ¶¶ 36-37, 40, 44, 50, 54. These judicial admissions are non-binding and nonconclusive.

As in *SemCrude*, in *WaMu* the court declined to find that two non-debtor trust vehicles were affiliates under section 101(2)(C) because the agreements in question were between two non-debtors and the agreements did not qualify as a lease or operating agreement. *WaMu*, 462 B.R. at 145-46. There, the debtors asserted that the trust vehicles were affiliates of the debtors under section 101(2)(C) based on pooling and servicing agreements between the trust vehicles and a subsidiary of a bank in which the debtors directly or indirectly owned all of the outstanding capital stock. The court rejected the debtors' argument that the pooling and servicing agreements constituted de facto operating agreements under the plain meaning of the statute.

The *WaMu* court also rejected the debtors' argument that they should be treated as a party to the agreements based on the debtors' organizational structure. Specifically, the debtors had asked the court to use allegations from the creditor's complaint underlying the proofs of claim—that the debtors "controlled the entire WaMu organization through the actions of its subsidiary entities"—to find that the debtors were parties to the agreements, and therefore the trust vehicles were affiliates under section 101(2)(C). *WaMu*, 462 B.R. at 146. The *WaMu* court found no support for the debtors' structural "control" argument and held the trust vehicles were not affiliates under section 101(2)(C). *Id.*; *see also Lehman Bros.*, 513 B.R. at 630 n.19 (similarly rejecting debtors'

16

assertion that certain trusts used to issue mortgage-backed securities were "affiliates" under section 101(2)(C) and highlighting language[9] in a prospectus document associated with the securities acknowledging that the trusts were not affiliates of the debtors).

The Trustee points out that, the Fifth Circuit adopts a broader interpretation of the phrase "agreement by a debtor" in section 101(2)(C) as shown in *Templeton v. O'Cheskey (In re American Housing Found)*, 785 F.3d 143, 157 (5th Cir. 2015), where it held that "an agreement may functionally be 'by' the debtor even where the debtor is not a party to the agreement." The court reasoned that where a debtor has "complete control" over its related limited partnerships, the limited partnership agreement is an operating agreement "by a debtor." *Am. Housing Found.*, 785 F.3d at 156. The bankruptcy court— which held a twenty-five day trial in the matter—found the debtor, and more specifically the founder, was actually the party in full control even though the limited partnership agreements had a non-debtor subsidiary named as the general partner. *Id.* The debtor was found to be the operator and the subsidiaries to be shell companies or "conduits through which [the debtor] acted." *Id.* at 157. But the bankruptcy court also noted that the creditor admitted that the founder, and thus the debtor, "exerted total control over all aspects" of the investments and the creditor did not object to or appeal the order confirming the plan which incorporated as affiliates all the limited partnerships at issue. *Id.* at 152, 156.

---

[9] *See* note 12, *supra*.

In reaching this holding, the Fifth Circuit acknowledged that its interpretation conflicts with those in *SemCrude* and *WaMu*, among others, and opined that those cases "applied unduly strict interpretations of the phrase 'agreement by a debtor'" in section 101(2)(C)'s definition of affiliate. *Id.* at 157. Nonetheless, the Fifth Circuit's "sufficient control" test appears limited to finding a non-debtor entity as an affiliate under section 101(2)(C) where it serves as "a shell conduit between a debtor and an entity—which in no way inhibits the debtor's ability to control and operate that entity." *Id.*

Here, the facts do not support finding that any of the Special Purpose Vehicles were affiliates of the Debtors under section 101(2)(C) because the Trustee has not shown the threshold requirement that a contract exists between a Special Purpose Vehicle and the Debtors. Under *SemCrude* and *WaMu*, Middlebury Securities is not an affiliate because the Sub-Placement Agreement is between two non-debtors: Middlebury Securities and AEI. In its papers and at oral argument, the Trustee argued that by virtue of being designated a Sub-Agent and by the language in Placement Agreement, "Middlebury" became a party to the Placement Agreement such that an operating agreement exists which is necessary to find the Membership Units are securities of an affiliate of the Debtors. The fact that there is a shared party—AEI—between the Sub-Placement Agreement and the Placement Agreement does not allow for the Debtors to be read into the Sub-Placement Agreement or for "Middlebury" to become a party to the Placement Agreement. There are two separate agreements with one shared non-debtor party and a

separate Stock Purchase Warrant between Fisker and Middlebury Securities, which cannot be deemed an operating agreement. These facts do not satisfy the definition in section 101(2)(C) of "affiliate."

Even under the Fifth Circuit's non-binding sufficient control standard, which the Trustee urges the Court to apply here, the Debtors did not exert sufficient control analogous to the control present in *American Housing Foundation* to conclude that one of the Debtors was a party to the Sub-Placement Agreement. In *American Housing Foundation*, the bankruptcy court held a twenty-five day trial in the subordination matter, hearing testimony and observing evidence related to the investments underlying the creditor's claims and stated the claims "frustrate legal analysis." *Am. Housing Found.*, 785 F.3d at 150. There, the creditor was a trial attorney who invested over $5 million in a 501(c)(3) non-profit, tax-exempt entity which developed low-income housing projects and related limited partnerships. *Id.* at 146-49. The founder and the creditor were acquaintances prior to these investments and in their course of dealing no intermediary or limited partnership in which the creditor invested affected the debtor's or founder's control over the operations. *Id.* at 147, 156-57. These critical facts led the bankruptcy court to conclude, and the Fifth Circuit to affirm, that the founder was actually the party in full control such that the limited partnership agreements for the entities in which the creditor invested were operating agreements "by a debtor" under section 101(2)(C).

Here, the record shows that AEI was an independent contractor under the Placement Agreement with Fisker. AEI was given authority to enter into agreements with other entities and to designate them as Sub-Agents to further induce participation by qualified investors. AEI was further tasked with responsibility to ensure compliance of any of its Sub-Agents.  Fisker was not to communicate directly with those Sub-Agents without AEI's authority. The Trustee has not suggested facts that would support its argument that the Debtors exerted control over Middlebury Securities, as the relevant party to the Sub-Placement Agreement with AEI, or the Special Purpose Vehicles. Moreover, as held by the court in *WaMu*, absent support, a debtor's "mere 'control' of an entity is [not] sufficient to ignore its legal separateness." *WaMu*, 462 B.R. at 146. Thus, the Trustee has not established that any of the Debtors exerted similar or sufficient control over Middlebury Securities or its Special Purpose Vehicles, and thus the Sub-Placement Agreement is not an "agreement by a debtor" or an "agreement with the debtor" under section 101(2)(C).

## CONCLUSION

For the reasons discussed, the Court will deny the Debtors' Objection and the Trustee's Objection to the Membership Unit Purchaser Claims. An Order will issue.

Dated:  January 10, 2017

KEVIN GROSS, U.S.B.J.